**Jim Loyd BENSON and wife, Shirley Benson, Plaintiffs/Appellees,**

v.

**TENNESSEE VALLEY ELECTRIC CO-OPERATIVE, Hobbs Equipment Company, Teco and James L. Clausel, Defendants/Appellants.**

Court of Appeals of Tennessee, Western Section at Jackson.

April 30, 1993.

Certiorari Denied by Supreme Court July 26, 1993.

Robert V. Redding, Waldrop & Hall, P.A., Jackson, and S. Craig Kennedy, Deusner & Kennedy, P.A., Selmer, for plaintiffs/appellees.

F. Lloyd Tatum, Tatum and Tatum, Henderson, for defendant/appellant, Hobbs Equipment Co.

Joe Hailey, Hailey & Seaton, Selmer, for defendant/appellant, TECO.

HIGHERS, Judge.

In this products liability case, Jim Benson was injured while working out of a bucket truck owned by his employer, Tennessee Valley Electric Cooperative ("TVEC"). A weld in the lower boom cylinder of the aerial device failed causing the bucket to drop six to eight inches and lunge back and forth several times. The product involved in this case is a vehicle-mounted elevating and rotating aerial device (boom unit) which was mounted on the back of the TVEC truck. TECO manufactured the boom unit and Hobbs Equipment Company ("Hobbs") sold the unit to TVEC.

Plaintiffs Jim Benson and his wife, Shirley Benson, (collectively "plaintiffs," individually "Benson" and "Shirley Benson") filed a lawsuit against TECO, Hobbs, TVEC and James L. Clausel, who was an employee of TVEC. Hobbs filed a cross claim against TECO for indemnity. The trial court granted summary judgment in favor of TVEC and Clausel and the case was ultimately tried before a jury against TECO and Hobbs. The court entered a $160,000 jury verdict in favor of Benson and a $25,000 jury verdict in favor of Shirley Benson and against Hobbs and TECO. Hobbs and TECO appealed.

The parties present a total of twenty-nine issues for our review, some of which are identical. We affirm.

TECO is an Indiana based company engaged in manufacturing boom units. Hobbs is an independent business located in Nashville, Tennessee, engaged in selling and providing repair and maintenance for boom units. In 1983, TECO sold the boom unit involved in this case to Hobbs who sold the device to TVEC and mounted it on a TVEC truck.

In February of 1986, Odell Franks, a TVEC mechanic, asked Hobbs to send a repairman to TVEC to help with repairs on the boom unit. Franks had worked as a mechanic for TVEC for twenty-three years. He performed most of the welding at TVEC but was not a certified welder. Franks called on Hobbs for help when he had repair work that he could not handle. There was no existing repair contract between Hobbs and TVEC.

Hobbs sent A.C. Stewart to TVEC to help Franks with the repairs. Stewart is a field service mechanic for Hobbs where he has been employed for seventeen years. Stewart had serviced TVEC equipment since 1974 and worked with Franks on several occasions. Stewart was not a welder and Franks knew that Stewart did not weld.

When Stewart went to TVEC he determined that certain pins and washers in the lower boom cylinder needed to be replaced. The function of the pin at issue is to hold the end of the lower boom cylinder and to lift the boom up and down. Stewart ordered the parts from TECO and returned to TVEC where he and Franks removed the lower boom cylinder and replaced the pins. They then attached bolts to the washers. The last step in the repair process was to weld the pin and the washer together to keep the pin from escaping. Franks did the welding.

On May 2, 1986, Benson was trimming tree limbs away from power lines while standing in the bucket suspended from the boom unit. Suddenly the pin holding the lower boom cylinder in place escaped and the boom unit dropped six to eight inches. The pin failure caused the bucket to jerk and produced two to three hard lunges. When the bucket came to rest, one of Benson's legs was out of the bucket and his elbow was jammed down between the bucket and the boom. He pulled himself back into the bucket and waited two hours for another bucket truck to arrive to help him down from his position. Benson

said that after the accident his ribs were aching, his stomach was burning and he felt dazed. Benson said that he injured his left shoulder, neck, lower back, stomach muscles, ribs, right hip and leg. He went to lunch with several co-workers and then returned to TVEC where he told his supervisor that he was going to the doctor.

Benson went to Dr. Peters who sent him to the hospital for x-rays. Apparently Benson's x-rays were normal. Benson returned to Dr. Peters on May 8, 1986, and Dr. Peters referred Benson to Dr. John Freeman, an orthopedic surgeon who treated Benson from May 8, 1986 through June 3, 1986. The record is silent as to what type of treatment Benson received except for a reference to "medication." Benson testified that his injuries did not improve during his visits to these physicians.

Because of problems with his stomach muscles, Benson returned to Dr. Freeman who referred Benson to Dr. Green on that same day, June 3, 1986. Dr. Green saw Benson on four other occasions up until October 16, 1986, and he treated Benson with pain and arthritis medication and muscle relaxants. On October 21, 1986, Dr. Green referred Benson back to Dr. Freeman who referred Benson to Dr. Joseph Rowland, a neurological surgeon.

Dr. Rowland's depositional testimony was read into evidence. Dr. Rowland treated Benson from October 23 through November 17, 1986. Dr. Rowland hospitalized Benson from November 2 through November 7, 1986, to perform a myelogram and a CAT scan. The test results of the myelogram were consistent with a bulging or degenerative L-4 disc on the right side but the CAT scan results showed no evidence of a bulging or ruptured disc. Dr. Rowland testified that these results corresponded clinically with the pain in Benson's right leg but Dr. Rowland concluded surgery was unnecessary because of an absence of any neurological findings. When a disc ruptures or bulges it can put pressure on the nerves which start in the back and go down the leg, however, in Benson's case there was not enough nerve impairment to necessitate surgery. Dr. Rowland testified that Benson did not have a

medical disability from a neurological standpoint and that Benson's bulging or degenerative disc most likely was present before the accident but may have been aggravated by it. He treated Benson with physical therapy and muscle relaxants.

From December 19, 1986 through May 16, 1988, Benson visited various physicians. Benson's primary complaints were lower back pain, stomach muscle problems, numbness in his right leg and toe dropping. He was treated with muscle relaxants.

Benson's lawyers referred him to Dr. Richard Ennis, an orthopedic surgeon who examined Benson on several occasions from May 16, 1988 up until the time of trial. Dr. Ennis' depositional testimony was read into evidence. Dr. Ennis diagnosed Benson with degenerative disc disease and degenerative arthritis of the lumbar spine with intermittent sciatica. He also noticed degenerative arthritis of the cervical spine and chronic abdominal muscle weakness secondary to the injury. Dr. Ennis prescribed medication for arthritis and pain and fitted Benson with a back support brace. He gave Benson a 15% permanent impairment rating to the body as whole based on degenerative changes in the lumbar spine, CAT scan and myelogram results which showed abnormalities of the L-4 disc and an EMG which showed atrophy of the leg and changes consistent with the L-4 disc abnormality. He testified that Benson should not lift over twenty-five pounds with any degree of frequency. Dr. Ennis stated that an accident of the type in which Benson was involved is commonly followed by degenerative changes such as Benson's. Dr. Ennis testified, however, that he could not say whether the May 1986 accident absolutely caused Benson's arthritis or aggravated a pre-existing condition because he had not viewed any x-rays from 1986.

Apparently at the request of TVEC, Dr. Kent Jones, a physician who practices general and vascular surgery, examined Benson because of his complaints of abdominal pain. Dr. Jones' depositional testimony was read into evidence at trial. Dr. Jones stated he was unable to demonstrate any hernial strain or tenderness in the abdominal wall that would account for Benson's complaints of

pain. Dr. Jones stated that Benson's pain appeared to be more musculoskeletal indicating injury to the muscles just along or above the bone of the hip joint and over the right kidney. Dr. Jones further testified that Benson would experience pain if his work involved manual labor because he was experiencing pain without doing manual labor.

At the time of trial, Benson was under Dr. Ennis' care but was not taking any medication for his injuries. Benson testified that his injuries from the accident have not improved. After the May 28 accident Benson never returned to his employment at TVEC. Benson testified that his ability to do any physical activity is very limited.

Benson testified that at the time of the accident he was making approximately $8.50 per hour and that he would have retired at age sixty-two or sixty-five. Benson testified after the accident that he worked as a security guard for four days but walking for long periods of time caused him too much pain. He has been unable to find any other employment.

Benson and his wife had been married for twenty-five years at the time of the trial. Shirley Benson testified that she and her husband have changed bedrooms because Benson is so restless at night and she has to get up and go to work in the mornings. She testified that Benson is unable to help her around the house as he did before the accident.

On April 30, 1987, plaintiffs filed a lawsuit against, as pertinent on appeal, TECO and Hobbs. Plaintiffs' complaint contained allegations against TECO for negligent design, manufacturing, testing and inspecting the boom unit, failure to warn, breach of warranty of fitness for a particular purpose and marketability, and for strict liability. Plaintiffs' complaint contained allegations against Hobbs for negligence in design, manufacturing and failing to test and inspect the equipment, failure to adequately warn, negligent repair, and breach of warranty of fitness for particular purpose and marketability. Plaintiffs alleged that their injury was proximately caused by the actions of the defendants and that defendants were jointly and severally liable to them. Benson alleged compensatory damages in the amount of $250,000 and punitive damages of $100,000. Shirley Benson alleged compensatory damages in the amount of $25,000 and punitive damages in the amount of $100,000. Hobbs and TECO denied the material allegations in the plaintiffs' complaint. Hobbs filed a cross claim against TECO alleging that it was entitled to indemnification in the amount of any judgment and cost awarded to plaintiffs and against Hobbs. TECO filed an answer denying the material allegations of Hobbs' cross claim. The court denied plaintiffs' motion to amend their complaint to increase Shirley Benson's allegations of damages.

The case was tried on April 2, 3, 5, 8, 1991, before a jury which returned a verdict in the sum of $160,000 in favor of Benson and $40,000 in favor of Shirley Benson against both Hobbs and TECO. Because Shirley Benson alleged compensatory damages of only $25,000, the court entered judgment in her favor for $25,000. The jury found in favor of TECO and against Hobbs on Hobbs' cross claim against TECO. The court's judgment on jury verdict states that the court found that the verdict as to Hobbs was based upon a finding of negligent repair and that the verdict as to TECO was predicated upon a finding of negligent design. Hobbs and TECO both filed a motion for a J.N.O.V. or in the alternative for a new trial. Hobbs filed a motion for J.N.O.V. in its cross suit against TECO. Plaintiffs filed a motion to alter or amend the judgment asking the court to allow them to amend their complaint to increase damages and a motion for discretionary costs. The court denied all of these motions. We have grouped the issues into five categories: (1) jury verdicts, (2) evidentiary issues, (3) jury instructions, and (4) plaintiffs' issues on cross appeal.

## JURY VERDICTS

TECO and Hobbs assert that there is no material evidence to support the respective jury verdicts entered against them. We must affirm if there is any material evidence to support the jury verdict. T.R.A.P. 13(d). "Accordingly, we do not reweigh the evidence and we do not reevaluate the witnesses' credibility on appeal from a jury verdict." *Gris-*

*som v. Metro. Govern. of Nashville*, 817 S.W.2d 679, 684 (Tenn.App.1991). The jury foreman stated that the basis of the jury's verdict against TECO was "not specifying on blueprint and we believe the pin was too short." The court interpreted this as a verdict based on negligent design. All testimony indicated that the specific cause of the boom's fall was the failure of the weld securing the pin to its retainer or washer. The focus of the evidence at trial was why the weld failed. TECO & Hobbs argued that the weld failed because Franks negligently welded the pin to the washer.

To prove negligence in a products liability action, the plaintiff must establish the existence of a defect in the product and that the defective condition was the result of negligence in the manufacturing process or that the manufacturer or seller knew or should have known of the defective condition. The primary focus in a negligence action is defendant's conduct and duty of care and, "[i]t is vital to trace the injury to some *specific error in construction* or design of the machinery to determine whether" the defect could have been avoided by exercise of reasonable care. *Browder v. Pettigrew*, 541 S.W.2d 402, 404 (Tenn.1976) (citations omitted) (emphasis in original). *See* T.C.A. § 29–28–105(a) (1980). There is material evidence to support the jury verdict.

Gilbert L. Rhoades, Jr., provided expert testimony in support of plaintiff's theory of negligent design and plaintiffs' other theories of liability. Rhoades is an accident reconstructionist and has been a licensed professional engineer since 1973. He conducted an investigation into the failure to the pin retaining system and performed an analysis of the manufacturing tolerances of the pin, the pin retainer or washer and the ear or side plates through which the pin passes. Rhoades introduced into evidence two drawings of the pin retainer system. The pin was 5.12 inches in the first drawing and 5.62 inches in the second drawing. The first drawing was based on a blueprint drawn by a TECO engineer in 1982. Rhoades explained that the distance between the inside faces of the plates in the pin retainer system is 3.62 inches and that each plate is ¾ of an inch

wide. The two plates are designed to hold the pin in place which holds the lower boom cylinder in place. The TECO design indicated that the pin was to be welded to the retainer with a ⅜ inch filet weld along the entire circumference of the pin where it was joined to the washer. Rhoades testified that the pin was ⅛ inch too short to fit flush at one end of the ears and still project ⅜ inches beyond the washer to accept the weld called for by the TECO design. This design created an increased probability that the single weld which retained the pin against lateral escape would break because it was inadequate. When the weld broke the washer could not prevent the pin from working loose and causing the base of the lower boom cylinder to drop.

The second drawing was based on a TECO blueprint drawn after 1982. The date on this blueprint was smudged, and, Rhoades testified that he could not determine whether TECO increased the length of the pin on January 3, 1983, 1986, or 1988. TECO does not have a system of documentation of what repairs were made on their units if the repairs are not made by TECO itself. Therefore, Rhoades was unable to find TECO's records of whether the pin that TVEC had ordered through Hobbs prior to the accident was 5.12 inches or 5.62 inches. After Benson's accident, the pin that escaped was placed back in the same TVEC boom unit but was thrown away in 1989, two years after Benson filed suit, when the boom unit was overhauled.

We have reviewed the evidence introduced by TECO with regard to the length of the pin and conclude that Rhoades' testimony is material evidence on which to support the jury's verdict. TECO's operations manager, Roger Vogel, testified that TECO lengthened the pin in 1983 because Mike Monroe's initials were beside the revision on the blueprint and Monroe worked for TECO in 1983. Vogel's testimony was somewhat impeached because TECO was unable unequivocally to establish who originally designed the boom unit. TECO's president and sole owner, Bruce Dammeyer, testified in his deposition that he was not sure how TECO originally came up with the design used to retain the

pin in place. In 1989, Dammeyer responded to an interrogatory of plaintiffs asking him to give the name(s) of persons responsible for the design of the boom unit and the design date by naming himself as the designer and February of 1983 as the design date. TECO amended its answer approximately two weeks before trial by replacing Dammeyer's name with Mike Monroe and "Foster" and then thereafter deleted Foster's name. Plaintiffs' counsel read a sworn interrogatory signed by Dammeyer on March 20, 1987, in which he states that Leonard L. Johnson designed the TECO boom unit. Although Stewart testified that the pin, as it appeared when he and Franks made the repairs in February of 1986, resembled Rhoades' drawing that reflected the 5.62 inch pin, we do not reweigh the evidence on appeal or assess the credibility of witnesses and, therefore, we conclude that Rhoades' testimony will support the jury's verdict of negligent design.

There is ample evidence to support the jury's verdict based on TECO's failure to specify in its repair manuals which welds were critical and should conform to certain American Welding Society ("AWS") standards. TECO specified that it complied with ANSI 92.2 which provided that the manufacturer shall specify in its drawings and manual those welds that are critical and therefore must conform to AWS standards. TECO did not specify that the weld at issue was critical on its blueprints and the instructions in TECO's repair manual did not specify any details regarding the type of welding rod, temperature, penetration, certification of welder, post-welding inspection or other criteria necessary to comply with the AWS standards. TECO's position was that all welds on the blueprint were critical and that the blueprints and repair manual directed the welder to outside publications that contained the specific standards listed *supra*. There was expert testimony, however, that the standard of care required TECO to label welds as "critical" and to provide standards for welding in their repair manual or in repair bulletins.

■ Hobbs argues that there is no material evidence in the record to support the jury's verdict of negligent repair because Hobbs had no duty to weld or instruct on the welding. Hobbs asserts that TVEC and Franks knew that Stewart was not a welder, that Stewart had not welded in the past, and that welding was not part of the TVEC–Hobbs' repair contract. The gist of Hobbs' argument is that it was under no duty with respect to the welding, a defective weld caused plaintiff's injuries, and therefore Hobbs owed no duty to the plaintiff.

Even assuming that Hobbs was not contractually obligated to weld, that does not conclusively establish that Hobbs owed no duty to plaintiff. The reasoning in *Metropolitan Gas Repair Serv., Inc. v. Kulik*, 621 P.2d 313 (Colo.1980), is particularly persuasive. In that case, plaintiffs brought a negligence action against Metropolitan for property damage resulting from the explosion of a gas operated boiler. Plaintiffs alleged Metropolitan Gas was negligent in failing to discover a plugged or obstructed safety release valve during repair work at plaintiff's home at various times prior to the explosion. Plaintiff's theory was that even though the defendants had not performed work specifically on the safety relief valve, their repairmen should have noticed its plugged or obstructed condition and their failure to do so constituted negligence. The trial court granted a directed verdict in favor of Metropolitan, finding that its contractual obligation was limited to installing a new pump motor and that it had no duty to inspect the safety valve. The Colorado Court of Appeals reversed and the Colorado Supreme Court affirmed the Court of Appeals. *Id.* at 316.

The Supreme Court noted that the issue related to the existence and scope of Metropolitan's duty to plaintiffs. Specifically, the court framed the issue as whether Metropolitan's legal duty to plaintiffs was restricted to its contractual obligation to install the motor pump and to that function only, or extended to the exercise of reasonable care and skill in performing that function, including a safety inspection of the boiler system. *Id.* at 317 n. 6. The court reasoned as follows:

The contractual obligation is not the touchstone of civil liability in tort. It is only the matrix from which an independent tort obligation may arise. In this case the

service contract created consensual obligations between the decedent and Metropolitan in relation to the boiler system in decedent's home. It did not, however, transform Metropolitan's contractual obligation into the measure of its tort liability arising out of its contractual performance. (citations omitted)

Where damage is to be foreseen, there is a duty to act so as to avoid it. Whether a defendant owes a legal duty to a particular plaintiff is a question of law. The court determines, as a matter of law, the existence and scope of the duty—that is, whether the plaintiff's interest that has been infringed by the conduct of the defendant is entitled to legal protection. In negligence cases the duty is to use reasonable care in light of the apparent risk. (citations omitted)

The flaw in the trial court's direction of a verdict lies in the application of the contractual standard of performance in measuring the defendant's duty in tort. In *Samuelson v. Chutich,* 187 Colo. 155, 159, 529 P.2d 631, 633–34 (1974), we adopted Justice Traynor's statement in *Gagne v. Bertram,* 43 Cal.2d 481, 275 P.2d 15 (1954), on a contractor's duty to its customer in the performance of a service contract:

" 'The services of experts are sought because of their special skill. They have a duty to exercise the ordinary skill and competence of members of their profession, and a failure to discharge that duty will subject them to liability for negligence. Those who hire such persons are not justified in expecting infallibility, but can expect only reasonable care and competence.' "

*Id.* at 317–18. *See Dooley v. Everett,* 805 S.W.2d 380, 383–86 (Tenn.App.1990).[1]

The only evidence in the record of the "contract terms" between Hobbs and TECO is Franks' admission that he knew Stewart did not weld and a Hobbs' repair invoice that stated "install new pins and bushings in lower boom cylinder and turret assembly." Stewart testified that the pins were not installed until they were welded. Determining the terms of the contract, however, is unnecessary because neither the existence or terms of a contract control our analysis. Even if Hobbs were under no contractual duty to do the welding, it had a duty to perform the repairs with reasonable care and skill and that question is a jury question. Vogel testified that it was customary in the industry for a serviceman to weld the pin himself or if not qualified, to make sure that he believed it was welded by a qualified individual. The jury could have concluded that to adhere to the standard of care Stewart must have at least informed Franks that this particular weld needed to be welded by a certified welder. In his deposition, Stewart said that there was probably no discussion about having a certified welder do the work on the date he and Franks repaired the boom unit. At trial, however, Stewart testified that there was a discussion about having a certified welder perform the weld and that he initiated that discussion. In a portion of his testimony, Franks said that Stewart did not suggest that a certified welder perform the weld but that he, Franks, suggested it. A portion of Franks' depositional testimony was read into evidence in which Franks stated, "I welded the pin exactly how he told me to weld it." He refers to Stewart. The jury could have concluded that Hobbs' failure to inform TVEC or Franks that this weld should have been welded by a certified welder, fell below the standard of care of repairmen.

■ Hobbs asserts that the trial judge should have directed a verdict in its favor and TECO asserts that the trial judge should have directed a verdict in its favor or granted motion for judgment notwithstanding the verdict (J.N.O.V.). Courts do not reweigh the evidence or reevaluate the witness' credi-

---

1. The *Dooley* court stated that, "Whether there is a duty owed by one person to another is a question of law to be decided by the court. However, once a duty is established, the scope of the duty or the standard of care is a question of fact to be decided by the trier of fact." *Id.* at 384. The court's use of the language "scope of the duty" was meant to describe the jury's role in determining whether the defendant has breached a duty to a plaintiff and not to the allocation of function between court and jury in the determination of the standard or measure of a defendant's duty. *Metropolitan Gas Repair Serv.,* 621 P.2d at 317.

bility when they rule on a T.R.Civ.P. 50 motion. *Holmes v. Wilson,* 551 S.W.2d 682, 685 (Tenn.1977). We view the evidence in a light most favorable to the motion's opponent and grant the motion only when the evidence can reasonably support but one conclusion. *Crosslin v. Alsup,* 594 S.W.2d 379, 380 (Tenn. 1980); *Holmes,* 551 S.W.2d at 685; *Grissom v. Metro Govern of Nashville,* 817 S.W.2d 679, 683 n. 2 (Tenn.App.1991). Our analysis *supra* of whether there is any material evidence to support the jury verdicts against Hobbs and TECO is a sufficient basis upon which we may conclude that the trial court did not err in denying TECO and Hobbs' motions for a directed verdict and TECO's motion for J.N.O.V.

Hobbs raises the issue of whether there is evidence to support the jury verdict in favor of TECO in Hobbs' cross suit against TECO for indemnification and whether the trial court erred in overruling Hobbs' motion for a directed verdict. Because we have found material evidence to support the jury verdict against Hobbs on the theory of negligent repair, these issues are without merit.

█ TECO and Hobbs next assert that the sums awarded by the jury to both plaintiffs were excessive and unreasonable and that the court erred in refusing to grant a remittitur. In overruling their motions, the court stated:

> Those portions of said motions attacking the size of the judgments and seeking a remittitur are specifically overruled because the court concludes that there was no passion or prejudice which affected the verdict and that the damages awarded are supported by the evidence.

Relying on *Foster v. Amcon Intern., Inc.,* 621 S.W.2d 142, 147 (Tenn.1981), and *Bates v. Jackson,* 639 S.W.2d 925, 926–27 (Tenn. 1982), Hobbs and TECO assert that the trial court applied an improper standard in denying their request for a remittitur. They assert that the trial judge has the power to suggest a remittitur even if the jury verdict is within the range of reasonableness. They assert that it is unnecessary for a trial judge, before suggesting a remittitur, to find that a jury verdict is so excessive as to indicate passion, prejudice, corruption or caprice and

that the court must do more than "merely" determine whether damages are supported by the evidence.

█ Hobbs and TECO have confused the authority of the trial court to grant remittiturs with the standard of review applicable to the court of appeals when reviewing a remittitur. T.C.A. § 20–10–102(a) (Supp.1992) authorizes a judge to grant a party's request for a remittitur "when the trial judge is of the opinion that the verdict in favor of a party should be reduced." A trial judge acts as thirteenth juror when making this determination. *Bates,* 639 S.W.2d at 927. In performing his duty as thirteenth juror, the trial judge is not bound to give reasons for his actions any more than the jury is bound to do so. *Overton v. Davis,* 739 S.W.2d 2, 2–3 (Tenn.App.1987). Nevertheless, the factors stated by the trial judge in this case, *supra,* are appropriate factors for the court to consider when making this decision and are not grounds for reversal.

█ When a judge grants a remittitur, and the case is appealed to this court we first determine the upper limit of the range of reasonableness of credible proof. We previously held under *Smith v. Shelton,* 569 S.W.2d 421, 427 (Tenn.1978), that when both the jury verdict and the trial judge's remitted verdict are within the range of reasonableness, reinstating the jury verdict was proper. *Foster, supra,* recognized that the effect of this interpretation of *Smith* was to prevent the trial judge from suggesting remittiturs when the jury verdict is within the range of reasonableness. *Foster* and *Bates* instruct that T.C.A. § 20–10–102 empowers the court to suggest a remittitur when the jury verdict is within the range of reasonableness and that the proper appellate review when both the trial court's remitted verdict and the jury's verdict are within the range of reasonableness is to determine from a review of the evidence "whether the trial judge's [action] in ... decreasing the verdict [was] justified, giving due credit to the jury's decision on the credibility of the witnesses and that of the trial judge in his capacity as thirteenth juror." *Bates,* 639 S.W.2d at 927 (citation omitted). We find no merit with

Hobbs and TECO's issue with regard to the standard that a trial judge should apply when determining whether a remittitur is appropriate.

■ When, as here, a trial judge has approved a jury award, our review is subject to the rule that if there is any material evidence to support the award it should not be disturbed. *Ellis v. White Freightliner Corp.,* 603 S.W.2d 125, 129 (Tenn.1980); *Coyle v. Prieto,* 822 S.W.2d 596, 601 (Tenn.App.1991). After reviewing the evidence in the record, we conclude that there is material evidence to support the jury verdict. Benson incurred medical bills totalling $4,356.71. Dr. Ennis' final diagnosis was degenerative disc disease and degenerative arthritis of the lumbar and cervical spine and chronic abdominal muscle weakness. He did not believe Benson could return to work involving physical labor. Dr. Ennis gave Benson a 15% permanent impairment rating to the body as a whole. He testified that Benson should do non-strenuous activities on a daily basis but nothing that would aggravate his neck or back. Benson was forty-two years old on the date of the accident. He had a ninth grade education and had done mainly manual labor during his working life except for a factory job in Chicago. At the time of his accident, he made $8.50 per hour and would have retired at sixty-two or sixty-five years of age from TVEC's employ. This is a basis on which the jury could have awarded Benson damages for lost earnings and loss of future earnings. Plaintiff Shirley Benson testified that she lost her husband's household services such as gardening and cleaning. She further testified that her husband had moved into another bedroom because of his restlessness at night.

■ TECO and Hobbs assert that the trial court erred in failing to credit the worker's compensation benefits received by Benson against the amount of the jury award. TECO and Hobbs assert that Benson is receiving a double recovery of his medical expenses and lost earning capacity because TVEC and its worker's compensation insurance carrier waived their subrogation rights.

This issue is without merit. Our courts have held that collateral source recoveries should not be the subject of a reduction for the defendants in a lawsuit. *Simpson v. Allied Van Lines, Inc.,* 612 S.W.2d 172 (Tenn.App.1980). In *Simpson,* the trial court held that defendant, Nabors Trailers, Inc., caused $42,500 damage to certain of plaintiff's property. The trial court reduced this amount by $10,000 because the United States Government had previously paid $10,000 to plaintiffs due to a contractual liability for the shipment of plaintiff's property. *Id.* at 175. This court said that the trial court, "in effect placed Nabors Trailers in the same position as the United States Government, the latter of which is not a party to this suit. There is no nexus between Nabors Trailers and the United States Government." *Id.* at 177. The court concluded that Nabors Trailers was not entitled to the $10,000 credit. Similarly, in this case, to allow a credit to TECO and Hobbs would be to place them in the same position as TVEC or its worker's compensation insurance carrier, neither of which is a party to this suit. Further, the *Simpson* court pointed out that in *Anderson v. Miller,* 96 Tenn. 35, 33 S.W. 615 (Tenn. 1896), the Tennessee Supreme Court stated, "The question of who will be entitled to the proceeds of a recovery, the insurer or the insured, is a matter between them, and constitutes no defense to an action for the damages caused by the wrong...." *Simpson,* 612 S.W.2d at 177. That reasoning is equally applicable to the case at bar.

## EVIDENTIARY ISSUES

■ TECO and Hobbs assert that the trial court erred in admitting three exhibits into evidence and allowing plaintiff's expert Rhoades to testify concerning the exhibits. The exhibits were prepared on large cardboard and contained various statements about the accident. The exhibits were entitled, "Findings about the Failure," "Causes of Failure," and "Conclusions." Hobbs objected to the first exhibit on the grounds that Rhoades' testimony was based on facts that were not in evidence and asked the court to instruct the jury that if Rhoades' testimony was based on such facts that Rhoades' testimony could not be used as substantive evidence of those underlying facts. The court

allowed the exhibits but granted Hobbs' requested instruction. T.R.E. 703 allows experts to base their opinions on facts not in evidence if (1) the facts are reasonably relied upon by experts in the particular field and (2) the facts are trustworthy. When an expert bases his opinion on facts that are not independently admissible into evidence, the trial judge should either prohibit the jury from hearing the foundation for the testimony or deliver a cautionary instruction. *See* T.R.E. 703 and Advisory Commission Comments. The court's instruction to the jury was proper and adequate.

■ In their motions for a new trial, both Hobbs and TECO assert that the court erred in admitting the three exhibits into evidence and permitting Rhoades to testify to their contents. Hobbs and TECO have waived these issues on appeal because they did not specifically state the basis of their objection to these exhibits in their motion for a new trial. Furthermore, the primary argument on appeal is that Rhoades' testimony did not substantially assist the trier of fact to understand the evidence which determined a fact at issue. *See* T.R.E. 702. Hobbs and TECO have waived this issue because they did not assert this as a basis for their objection in the trial court, and, we will not address it on appeal. T.R.A.P. 3(e), 36(a); *State v. King*, 622 S.W.2d 77, 79 (Tenn.Cr.App.1981). Therefore, we find no merit with these issues. TECO asserted on appeal that the court should have disallowed Rhoades' opinions which were based on facts not in evidence. Although TECO does not point to any specific portion of the exhibits or Rhoades' testimony, we have discussed the substance of this issue *supra*, and it is meritless.

■ Hobbs and TECO next assert that the court erred in allowing into evidence an investigative report of the accident that was prepared by David Grabner, a mechanical engineer for TECO. Plaintiffs used the report in their cross-examination of Vogel, TECO's operations manager and a mechanical engineer. Part of the report states that Benson "apparently ruptured or bruised his abdomen; possibly a slipped disc." The report indicates that Grabner obtained this information from Douglas McLain, a TVEC employee, and from TVEC personnel records. Over hearsay objections by TECO and Hobbs, the court admitted the report as substantive evidence of Benson's injuries, ruling that the report was an admission against interest. The statement in Grabner's report that plaintiff wants to introduce presents us with a multiple hearsay problem. The primary statement, the report, is admissible pursuant to 803(1.2)(C), and as such, may be offered to prove that the included statement about Benson's injuries was made. Plaintiffs, however, want to introduce the included statements for the truth of the matter asserted that Benson "apparently ruptured or bruised his abdomen; and had a possible slipped disc." This is hearsay. T.R.E. 801(c). We must determine whether there is a hearsay exception that will allow the included statement as substantive evidence. *West End Recreation, Inc. v. Hodge*, 776 S.W.2d 101, 105–06 (Tenn.App.1989). TVEC's personnel records were not introduced into evidence so we are concerned only with McLain's statements to Grabner as the basis for Grabner's statements in the investigative report. Plaintiff seems to concede that McClain's statements are hearsay because they do not point to an applicable hearsay exception, nor have they presented any argument as to why McClain's statements are not hearsay. We conclude that none of the hearsay exceptions in T.R.E. 803 or 804 are applicable to McLain's statements. We therefore conclude that the trial court erred in admitting the portion of Grabner's investigative report relating to Benson's injuries.

■ An error does not of itself necessarily require reversal. T.R.A.P. 36(b) provides that, "A final judgment from which relief is available and otherwise appropriate shall not be set aside unless, considering the whole record, error involving a substantial right more probably than not affected the judgment or would result in prejudice to the judicial process." *See Blackburn v. Murphy*, 737 S.W.2d 529, 533 (Tenn.1987) ("[t]he admission of improper evidence of a fact in issue is harmless where the verdict or judgment is supported by sufficient competent

evidence....") *Bishop v. R.E.B. Equipment Service, Inc.*, 735 S.W.2d 449, 452 (Tenn.App. 1987), ("Ordinarily, an error in admitting evidence is harmless if the fact shown by the offending evidence is also shown by other evidence in the record which is competent. If it appears to the reviewing court from on examination of the whole record that the verdict is unlikely to be different in the event of a retrial, the error must be considered to be harmless." (citations omitted)).

We cannot say that the evidence more probably than not affected the judgment. Our examination of the record as a whole indicates there is sufficient evidence of the statements in the reports and that the verdict is unlikely to be different in the event of a retrial. The investigative report says *"apparently"* rupture or bruised abdomen and *"possibly"* a slipped disc. These statements are not unequivocal assertions that Benson was injured. They are speculative and therefore we have looked to the record for evidence of a similar nature. Benson testified that following the accident he felt pain in his abdomen and sought medical treatment. Both Dr. Rowland and Dr. Ennis testified that there was some abnormality with Benson's L–4 disc but that it was not ruptured.

TECO asserts that the trial court erred in allowing plaintiffs to read into evidence TECO's answer given under oath to an interrogatory in another lawsuit. The interrogatory asked TECO to name the person responsible for designing the same model of boom unit as in the present case. TECO answered, "Leonard L. Johnson." The court carefully limited the proof to a reading of the substance of the question and answer, without having the jury know it was given in a separate action involving the same machine. Plaintiffs offered the answer as evidence of lack of design and to attack the credibility of TECO who had previously maintained that Dammeyer designed the unit and then that Mike Monroe designed the unit. TECO's objection to the admission was that this question was asked in the context of another lawsuit that involved a different part of the boom unit and that plaintiffs were attempting to prejudice TECO on an irrelevant matter because of TECO's inconsistent answers on

the question of who designed the boom unit. We find no merit with TECO's assertions and conclude that the court properly admitted this evidence pursuant to T.R.E. 803(1.2)(A). Further, we find no error with the trial court's refusal to exclude this evidence under T.R.E. 403.

TECO next asserts that the trial court erred in allowing evidence of a subsequent remedial measure taken by TECO. TECO's engineering expert, James F. Hills, testified that in his survey of equipment similar to TECO's boom unit he looked at a TECO design that had a different pin retention system than the TECO boom unit in 1986. The retention system was different in that TECO had installed a roll pin through the retaining pin as an additional safety measure should the weld between the washer and retaining pin system break or if the bolts were not properly tightened. Hills had previously testified that the pin retention system of TECO, welding the pin to the washers and securing the pins with bolts was "state of the art," and that alternative designs did not offer any improvement over the use of welding and offered less security. T.R.E. Rule 407 provides in pertinent part that, "evidence of the subsequent remedial measures is not admissible to prove strict liability, negligence, or culpable conduct in connection with the event. This rule does not require the exclusion of evidence of subsequent measures when offered for another purpose, such as proving controverted ownership, control, or feasibility of precautionary measures, or impeachment." Although it appears to this court that the court's allowance of Hill's testimony was not a violation of T.R.E. 407, we conclude that even if it were error, it was not harmful error pursuant to Rule 36(b), *supra,* because the jury's verdict was based on the negligent design and TECO's failure properly to instruct as to repairs. This evidence therefore did not affect the jury verdict.

## JURY INSTRUCTIONS

Hobbs takes issue with the trial court's failure to submit its requested jury instructions to the jury.

The trial court's instructions are the jury's only proper source of the legal prin-

ciples to guide its deliberations. Accordingly, trial courts should give substantially accurate instructions concerning the law applicable to the matters at issue. The instructions need not be perfect in every detail, as long as they are, as a whole, correct. (citations omitted)

. . . .

Trial courts should give a requested instruction if it satisfies three requirements: (1) it is supported by the evidence, (2) it embodies the party's theory, and (3) it is a correct statement of the law. However, they need not give a special instruction whose substance is already covered in the general charge. (citations omitted)

*Mitchell v. Smith*, 779 S.W.2d 384, 390-91 (Tenn.App.1989) (citations omitted).

Hobbs' special requests for jury instructions number 4, 11, and 12 relate to basing Hobbs' liability on negligent or defective welding. The basic assumption upon which these three jury instructions rest are that Hobbs and TVEC had a contract pursuant to the terms of which Hobbs was under absolutely no responsibility for welding the pin to the washer. Therefore, Hobbs owed no legal duty to the plaintiff. As we have discussed, *supra*, this is not a correct statement of the law of negligence. The issues based on these three jury instructions are without merit. Hobbs also takes issue with the court's refusal to grant its special request for jury instruction number 13 which relates to Rhoades' testimony about the exhibits discussed *supra*. Hobbs' requested instruction in substance is the same instruction that the trial court gave to the jury at the time Rhoades testified. Further, the following is included in the court's general instructions to the jury. "Questions have been asked in which an expert witness was asked to assume that certain facts were true and to give an opinion based upon that assumption. If any fact assumed in the question has not been established by the evidence, you should determine the effect of that omission upon the value of the opinion." Furthermore, defendant has not pointed out any fact relied upon by Rhoades that was not proven at trial. We find no merit with this issue.

■ TECO has presented four issues concerning the court's jury instruction. First, TECO asserts that the trial court erred in limiting TECO's special request number two to the issue of strict liability. A portion of TECO's requested jury instruction is as follows:

> Thus, if you find that the injuries, if any, complained of by the plaintiff were proximately caused by improper maintenance, servicing or repair of the Gemini Four unit in question, and that the negligently performed maintenance, service or repair was done by someone other than an employee of TECO, then you should return a verdict in favor of TECO *under the issue of strict liability.*

■ TECO's requested instruction basically absolved it of any responsibility for negligence of persons who subsequently made repairs to its product. The court charged the jury that plaintiffs had the burden of establishing, as to TECO; (1) negligent design or manufacture; (2) failure to warn or instruct concerning proper methods of repair or inherent dangers; (3) failure to properly inspect; (4) [strict liability due to] manufacturing unreasonably dangerous or defective product; and (5) breaches of implied warranties. Again, even if the court erred in refusing this request, we do not find that it more probably than not affected the verdict of the jury. T.R.A.P. 36(b). The jury's verdict was based upon negligent design and improper instructions. The court did not err in failing to instruct the jury as TECO requested on the issue of failure to warn or instruct concerning proper methods of repair or for inherent dangers. Further, we find no error with the court's refusal to give this instruction based on negligent design or manufacture because there can be two proximate causes of an injury brought about by the negligence of two defendants. In other words, TECO's negligent design and TVEC or Hobbs' negligent repair could be concurrent proximate causes of Benson's injuries. *Kelley v. Johnson*, 796 S.W.2d 155 (Tenn.App.1990).

■ TECO next asserts that the trial court erred in instructing the jury that one of the plaintiffs' theories for recovery was that

TECO failed to warn or instruct concerning the methods of repair because there is no such allegation in plaintiffs' complaint and the evidence positively shows that TECO did warn and instruct. This issue is without merit. T.R.Civ.P. 15.02 provides:

When issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they have been raised in the pleadings. Such amendment of the pleadings as may be necessary to cause them to conform to the evidence and to raise these issues may be made upon motion of any party at any time, even after judgment; *but failure so to amend does not affect the result of the trial of these issues.*

Further, we have previously reviewed the material evidence to support the jury's verdict on improper instructions.

TECO next takes issue with two of the court's instructions to the jury on plaintiffs' theory of strict liability and breach of warranty. TECO asserts that there was no evidence to support these theories. We find no merit with this issue because the instructions did not affect the jury verdict. T.R.A.P. 36(b).

## PLAINTIFFS' ISSUES ON CROSS-APPEAL

The plaintiffs have raised two issues on cross-appeal. First, they assert that the trial court erred in denying their motion to amend the damages alleged in the complaint. Specifically, plaintiffs object to the trial court's denial of their motion to increase Shirley Benson's alleged damages from $25,000 to $40,000. Plaintiffs filed their complaint on April 30, 1987, and Shirley Benson alleged compensatory damages in the amount of $25,000. Plaintiffs filed a motion to amend their complaint to increase damages on February 27, 1991, in which they asked the court to allow Shirley Benson to increase her alleged compensatory damages to $1,000,000. The case was set for trial April 2, 1991. In a pre-trial conference held on March 28, 1991, the court denied plaintiffs' motion to increase damages. After trial in early April the jury returned a $40,000 verdict in favor of Shirley Benson which the court reduced to $25,000 because of Shirley Benson's allegations in the original complaint. Plaintiffs filed a post-trial motion to alter or amend the judgment asking the court to allow the plaintiffs to amend their complaint to allege damages of $40,000 on behalf of Shirley Benson. The court denied this motion. T.R.Civ.P. 15.01 directs that "leave [to amend] shall be freely given when justice so requires." The timing of plaintiffs' original motion to increase damages presents the possibility of prejudice to the defendants and therefore we find that the court did not abuse its discretion in denying plaintiffs the right to increase their damages prior to trial. *Walden v. Wylie,* 645 S.W.2d 247, 250 (Tenn.App.1982). Further, we find no error with the court's refusal to alter or amend its judgment to allow plaintiffs to increase damages post-trial. T.R.Civ.P. 15.02 specifically disallows amendments to increase the amount of damage sued for after the verdict.

Second, plaintiffs assert that the court abused its discretion in failing to award costs to plaintiffs pursuant to T.R.Civ.P. 54.-04. A court's award of costs pursuant to 54.04 is discretionary and we find no abuse of discretion in this case in light of the amount of the jury verdicts.

The judgment of the trial court is affirmed. Costs are assessed to the appellants.

TOMLIN, P.J. (W.S.), and CRAWFORD, J., concur.