IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs August 1, 2022

## STATE OF TENNESSEE, EX REL. HERBERT SLATERY III v. THE WITHERSPOON LAW GROUP PLLC, ET AL.

**Appeal from the Chancery Court for Hamilton County**
**No. CH-17-0279     Pamela A. Fleenor, Chancellor**

———————————————————

**No. E2021-01343-COA-R3-CV**

———————————————————

This appeal involves an action brought by the State of Tennessee for alleged violations of Tennessee's statutes regarding the unauthorized practice of law and the Tennessee Consumer Protection Act. The State of Tennessee claimed that the defendants improperly solicited clients who were in the process of making funeral arrangements for their recently deceased children. Following a trial, a jury returned a verdict unanimously finding in favor of the State of Tennessee and assessing civil penalties against the defendants. Accordingly, the trial court entered judgment against the defendants. The defendants appeal. We affirm and remand for further proceedings consistent with this opinion.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed and Remanded**

CARMA DENNIS MCGEE, J., delivered the opinion of the court, in which W. NEAL MCBRAYER and KRISTI M. DAVIS, JJ., joined.

Darrell J. O'Neal, Memphis, Tennessee, for the appellants, The Witherspoon Law Group PLLC, Nuru Witherspoon, Alphonso McClendon, and Glenn Smith.

Jonathan T. Skrmetti, Attorney General and Reporter, Andrée S. Blumstein, Solicitor General, David McDowell, Deputy Attorney General, Kelley L. Groover, Senior Assistant Attorney General, Dean S. Atyia, Assistant Attorney General, and Matthew F. Jones, Assistant Attorney General, for the appellee, State of Tennessee.

## OPINION

### I.     FACTS & PROCEDURAL HISTORY

This case concerns violations of Tennessee's statutes regarding the unauthorized practice of law (the "UPL Statute") and the Tennessee Consumer Protection Act ("TCPA") by The Witherspoon Law Group PLLC ("the Firm"), Mr. Nuru Witherspoon, Mr. Alphonso McClendon, and Mr. Glenn Smith (collectively, "Defendants"). Mr. Witherspoon is the sole owner of the Firm and is licensed to practice law but not in Tennessee. Mr. McClendon and Mr. Smith are nonlawyers who worked for the Firm. Defendants solicited four different families in Tennessee who were each in the process of making arrangements at funeral homes for their recently deceased children. Defendants solicited the Myers family while they were in the process of making funeral arrangements at a funeral home in Memphis and solicited the Jones, Nash, and Wilson families while they were at a funeral home in Chattanooga.

In April 2017, the State of Tennessee ("the State") filed a "Civil Enforcement Complaint" against Defendants. The allegations contained in the first paragraph of the State's complaint are worth repeating:

> This public interest proceeding seeks to redress consumer harm in Tennessee that exists as a result of Defendants' unlawful practice of law in this state and Defendants' unfair, deceptive, and misleading in-person solicitations of accident victims and their families. Defendants target victims of recent catastrophes, approach them at funeral homes, misrepresent their status as attorneys, and attempt to procure signed attorney fee agreements that incorporate litigation finance contracts. Defendants do not fully explain the content of these documents, intentionally misleading traumatized victims and family members in order to unlawfully reap profits from these vulnerable, grieving individuals. Defendants should not be permitted to profit from these illegal solicitation tactics and the practice of law without proper licensure.

Based on Defendants' conduct, the State alleged violations of the UPL Statute, Tennessee Code Annotated section 23-3-101, *et seq.*, and the TCPA, Tennessee Code Annotated section 47-18-101, *et seq.* The State specifically alleged violations of section 23-3-103 of the UPL Statute. As for the TCPA, the State specifically alleged violations of section 47-18-104(b)(2), (3), (5), (12), and (27). Defendants then filed their answers to the State's complaint.[1]

---

[1] Mr. Witherspoon, acting pro se, filed answers to the State's complaint on behalf of himself and the Firm. The State filed a motion for an order enjoining the Firm's unauthorized practice of law pursuant to section 23-3-103(c)(3). It contended that the Firm could not proceed pro se in any Tennessee tribunal under Tennessee law. More precisely, it noted that Mr. Witherspoon filed a pro se answer on behalf of the Firm in his capacity as a corporate officer. Therefore, it argued that the Firm's pro se answer was improper because it constituted the unauthorized practice of law. In response to the motion, the trial court entered an agreed order striking the Firm's answer from the record pursuant to Tennessee Rule of Civil Procedure

In June 2019, the State filed a motion for leave to file an amended complaint, which was granted by agreed order. Among other things, the State amended its complaint to add a violation of section 23-3-108 of the UPL Statute, asserting that Mr. McClendon and Mr. Smith directly or indirectly advertised or held themselves out to be lawyers. Defendants filed an answer to the amended complaint and subsequently filed an amended answer. In their amended answer, they asserted what they described as six affirmative defenses: (1) failure to state a claim upon which relief can be granted, specifically concerning Mr. Witherspoon's and the Firm's compliance with Tennessee Rule of Professional Conduct ("RPC") 5.5(c); (2) failure to state a claim upon which relief can be granted, specifically concerning Defendants compliance with RPC 5.3; (3) collateral estoppel; (4) res judicata; (5) lack of subject matter jurisdiction; and (6) reservation of the right to raise any further affirmative defenses. The State filed a motion to strike Defendants' affirmative defenses in their amended answer which was denied. The trial court subsequently ruled on several other motions filed by the parties, and the case eventually proceeded to trial.

The trial court tried the case before a jury from November 9, 2021, until November 12, 2021. On the first day of trial, Mr. John Taylor testified as one of the funeral directors at Taylor Funeral Home ("TFH") in Chattanooga who dealt with the Jones, Nash, and Wilson families. In regard to Defendants, he stated he first met Mr. Witherspoon and Mr. McClendon at a convention for the funeral industry. He said that a friend from the funeral industry in Memphis contacted him and asked if he had reached out to the Firm. He then received a phone call from either Mr. Witherspoon or Mr. McClendon, who wanted to be introduced to the families. He received phone calls from other law firms but only allowed someone from the Firm to come to the funeral home because he knew of their services. He explained, "I think more so that we wanted to introduce [the Firm] because of their services that they rendered." He thought that the Firm could assist the families and "foresee any concerns or different things of that nature" based on its reputation.

Mr. Taylor testified that Mr. McClendon was the only person who came to the funeral home on behalf of the Firm; neither Mr. Witherspoon nor Mr. Smith ever came to speak with the families. He described Mr. McClendon as the person who handled the ground work and presumed that Mr. McClendon was the fieldworker who came to gather information to see what the Firm could do for the families. He believed that Mr. McClendon's primary objective was to answer questions that the families had. He felt comfortable having someone from the Firm answer those questions. He stated that he knew that Mr. McClendon was not a lawyer. Additionally, he testified that no one from the funeral home told the families that they would not be able to bury their children if they did

---

11.01. The trial court permitted the newly retained counsel for Defendants to file a proper answer for the Firm and an answer or other response for Mr. McClendon and Mr. Smith. Thereafter, the Firm, Mr. McClendon, and Mr. Smith each filed an answer to the complaint by and through their counsel. Additionally, Mr. Witherspoon, by and through the same counsel, filed an amended answer to the complaint.

not sign with the Firm. He said that he just wanted to provide information to the families that wanted it.

Ms. Anita Taylor also testified as one of the funeral directors at TFH in Chattanooga who dealt with the Jones, Nash, and Wilson families. Each of the three families came within a week following the accident to make funeral arrangements for their children. She described her interactions with the families and the interactions she witnessed between Mr. McClendon and the families. She agreed that the families were there for the purpose of burying their children and not for a presentation from a law firm. Furthermore, she stated that Mr. McClendon did not threaten the families or say that they would not be able to bury their children if they did not sign up with the Firm.

On the second day of trial, Ms. Nash testified about her interaction with Mr. McClendon at TFH. A couple of days after her child's death, she went to TFH to make funeral arrangements and met with Mr. and Mrs. Taylor. She stated that she was not concerned about any possible case she might have had at that time; instead, she was just focused on burying her child. Her intentions at the time were to view her child's body, make arrangements, and go home. She explained that she would have spoken with her attorney, Mr. Lloyd Levitt, if she needed any legal help. Nevertheless, she was asked about being introduced to some lawyers that were present at the funeral home. She stated that she was surprised by this and did not want to talk to anyone at that time "[b]ecause it wasn't the time or place to talk about everything."

Still, Ms. Nash testified that she and her family members were put in a room and were introduced to Mr. McClendon who told her what he could do for her if he was allowed to represent her. Afterward, she considered the offer, but she explained that she first ran it by her attorney, Mr. Levitt, before she made a decision. Without having done so, she testified that she probably would have accepted the offer because it sounded good and she was in a "weak state of mind" at that time. As a result of her interaction with Mr. McClendon, she testified that she felt violated. She further explained as follows:

> I felt like they shouldn't do that to nobody. You shouldn't wait for somebody to go bury the[ir] daughter and put them in a room and ask them, "Well, ma'am, if you sign with us we can get you this much money. And if you do sign with us, ooh, we can pay for your funeral arrangements."

As such, she informed her attorney, Mr. Levitt, that she wanted to file a complaint because she felt what had happened to her was inappropriate.

For the next witness, the State called Ms. Myers by deposition and read excerpts from her deposition. A couple of days after her child's death, Ms. Myers and some of her family members went to Signature Funeral Home ("SFH") in Memphis to go over the cost of the funeral arrangements for her child. Mr. Rodney Williams, who was an SFH

- 4 -

employee, assisted them. She described her interactions with Mr. Williams, who told her that he knew some people that could help with the funeral expenses. She then was contacted by Mr. Smith who told her that he was going to help her. Ms. Myers stated that she did not speak with Mr. Smith again, but that Mr. Williams contacted her to ask if she was going to sign the paperwork sent by Mr. Smith. Ms. Myers expressed uncertainty but ultimately signed the paperwork sent to her by Mr. Smith. She then received $11,000.00 to pay for the funeral, but she never saw the check. She explained that she was told the money was a loan she would have to pay back after she received settlement proceeds. According to Ms. Myers, Mr. Smith told her she would probably receive $50,000.00 in settlement proceeds. Ms. Myers subsequently hired Mr. Blount to represent her in the wrongful death claim for her child's death. However, Mr. Blount reviewed Ms. Myers's paperwork and informed her that the Firm was supposedly representing her, which she was unaware of at the time. She was unaware that the Firm was representing her because that was not how it was explained or presented to her. It was Ms. Myers's understanding that the Firm was going to help her take care of the funeral and that she would have to pay them back. Ms. Myers concluded by stating that she was not upset with the Firm for what they did because she appreciated them for taking care of the child's funeral. She just did not understand at the time that the Firm was representing her.

Mr. Blount, who was Ms. Myers's attorney, testified that Ms. Myers came to see him within a week or two after her child's death and brought some paperwork from Universal Funding Inc. and from the Firm. After reviewing the paperwork, he determined that Ms. Myers had entered into a purchase agreement with Universal Funds Inc. in which they agreed to purchase a portion of the settlement proceeds from Ms. Myers's wrongful death claim. He also asked Ms. Myers if she had hired the Firm to represent her, and Ms. Myers responded in the negative. It appeared to him that Ms. Myers had purportedly hired the Firm and that she needed to decide whether she wanted to continue with the Firm or hire him to represent her. Ms. Myers decided that Mr. Blount should represent her, so he wrote a letter to the Firm informing them of his representation of her. He then received a response from the Firm which asserted that Ms. Myers did in fact hire them to represent her in the wrongful death claim. Additionally, the Firm asserted that they were going to settle the case with the driver's insurer or that they were going to assert an attorney lien for a third of the total settlement. However, Mr. Blount did not believe that Ms. Myers had a continuing attorney-client relationship with the Firm or that she owed the Firm any money. He proceeded to file a lawsuit on her behalf against the Firm in order to resolve the dispute.

Mr. Witherspoon, who was the sole owner of the Firm, testified that he was an attorney, but he did not have a license to practice law in Tennessee or an office in Tennessee. He admitted that he was "absolutely responsible" for everything that happened at the Firm, which included hiring, training, and supervising employees. He also admitted that he was aware of Mr. McClendon's and Mr. Smith's activities in Tennessee that are the subject of this case. He testified that Mr. McClendon and Mr. Smith were independent contractors who worked for the Firm. Therefore, he stated he could not control them for

the most part. However, he did admit that he was responsible for their work and offered them guidance on what they could and could not do. He told them three things: never say you're an attorney; never make any promises; and always tell the truth. He testified that he was "a pretty good attorney," but he admitted that on one prior occasion he was found to have made misrepresentations to a court.

Mr. Witherspoon also testified that Mr. McClendon and Mr. Smith knew to give a person paperwork to sign only if it was asked for and wanted. He said it was fine whether that person chose to sign the paperwork or not. After the Jones family and the Myers family completed their respective wrongful death intake forms from the Firm, he began working on their cases. However, he stated that the Firm was then terminated by both the Jones family and the Myers family. Ultimately, he did not get paid for his representation of either family. He explained that he did not file an attorney lien against the Jones family. He further explained that he filed an attorney lien against the Myers family but later released it.

At the conclusion of the second day of trial, the State rested its case-in-chief. On the third day of trial, Defendants moved for a directed verdict on several issues regarding the UPL Statute and the TCPA. The State conceded and nonsuited the claim as to Mr. Smith for a violation of Tennessee Code Annotated section 23-3-108, i.e., holding himself out as a lawyer. However, the State argued that there was ample evidence for the jury to return a verdict in favor of the State on the remainder of the claims against the Defendants. The trial court accepted the State's nonsuit in regard to Mr. Smith's violation of Tennessee Code Annotated section 23-3-108 and denied Defendants' motion for directed verdict.

Afterward, Ms. Terita Hewlett testified as a Tennessee attorney who was familiar with Mr. Witherspoon. She represented the Firm in the lawsuit that Ms. Myers filed against it in December 2016. She described the lawsuit as "two attorneys fighting over a client." She explained that the case was ultimately dismissed with prejudice because Mr. Witherspoon released the attorney lien and that Mr. Witherspoon received no payment for his representation of Ms. Myers. After the conclusion of Ms. Hewlett's testimony, Defendants rested their case.

The State then moved for a directed verdict on just the UPL claims. The State argued that there was overwhelming evidence that Tennessee Code Annotated section 23-3-103 of the UPL Statute was violated by Mr. Witherspoon, Mr. Smith, and Mr. McClendon and that those defendants were liable under the UPL Statute. Additionally, the State argued that Mr. McClendon was liable for holding himself out as a lawyer for the Firm and that Mr. Witherspoon was responsible for that action. The trial court did not grant the State's motion for directed verdict, but instead decided to submit the action to the jury subject to a later determination of the legal questions raised by the State's motion pursuant to Tennessee Rule of Civil Procedure 50.02. The State also moved for a directed verdict on Defendants' affirmative defenses of subject matter jurisdiction, res judicata, and

collateral estoppel, which the court granted. Defendants then proffered testimony from Ms. Hewlett and Mr. Witherspoon outside the presence of the trial judge and the jury.

On the fourth day of trial, the jury was charged by the trial judge. After deliberation, the jury returned a unanimous verdict in favor of the State and assessed civil penalties against Defendants. The jury found that Mr. Smith and Mr. McClendon engaged in solicitation in violation of the UPL Statute, Mr. McClendon falsely advertised himself or held himself out as a lawyer in violation of the UPL Statute, and Mr. Witherspoon was responsible for the conduct of Mr. Smith and Mr. McClendon. In regard to the TCPA, the jury found that Mr. Smith and Mr. McClendon committed unfair or deceptive practices in violation of the TCPA and that Mr. Witherspoon and the Firm acted in common enterprise with Mr. Smith and Mr. McClendon. Thereafter, Defendants prematurely filed an appeal.[2] The trial court then entered an order of judgment against Defendants in December 2021.

Afterward, the State filed a motion for a permanent injunction against Defendants and a motion for attorneys' fees and costs. Defendants filed a "Motion to Alter or Amend or to Grant a Directed Verdict or Judgment Notwithstanding Verdict." In January 2022, the trial court entered an order permanently enjoining Defendants from, among other things, soliciting legal clients who reside in Tennessee without first obtaining a license to practice law in Tennessee. The trial court entered an order granting the State's motion for reasonable attorneys' fees and costs including a reasonable fee for its expert. The trial court referred the issue of the amount of reasonable fees and the proof of the requested costs to the clerk and master. The trial court subsequently entered an order denying Defendants' motion to alter or amend or to grant a directed verdict or judgment notwithstanding the verdict. In March 2022, the clerk and master submitted a report on fees and expenses. The trial court then entered an order on the State's attorneys' fees and costs and an order taxing costs to Defendants.

## II.    ISSUES PRESENTED

Defendants present the following issues for review on appeal, which we have slightly restated and rearranged:

1. Whether the trial court erred when it accepted jurisdiction of the prosecution of an attorney in good standing, his law firm, and independent contractors prior to the Tennessee Board of Professional Responsibility holding a hearing that they failed to comply with multijurisdictional practice of law in Tennessee;
2. Whether the trial court erred when it denied an out-of-state attorney licensed in three states and in good standing the right to temporarily practice law in Tennessee without allowing him the benefit of RPC 5.5(c)(2) as authorized by the Tennessee

---

[2] "A prematurely filed notice of appeal shall be treated as filed after the entry of the judgment from which the appeal is taken and on the day thereof." Tenn. R. App. P. 4(d).

Supreme Court when the unauthorized practice of law is criminal or quasi criminal;

3. Whether the trial court erred when it determined that Mr. Witherspoon and the Firm were vicariously liable for the conduct of independent contractors;

4. Whether the trial court erred when it determined that Defendants engaged in impermissible conduct relative to the Myers, Jones, Nash, and Wilson families when no material evidence was adduced to support any violation by Defendants;

5. Whether the trial court erred when it determined that there was competent evidence to raise a claim against Mr. McClendon when Ms. Nash only stated it was an "old guy" that spoke to her, but she could not identify the person; and

6. Whether the trial court erred when it determined that there was competent evidence to establish Mr. Smith committed any violations when Ms. Myers asked Mr. Williams to assist her with an attorney.

The State presents the following issues for review on appeal, which we have slightly restated and rearranged:

1. Whether the trial court properly exercised subject matter jurisdiction;

2. If the issue was not waived, whether the trial court abused its discretion in excluding any evidence in support of an affirmative defense under RPC 5.5;

3. If the issue was not waived, whether the trial court properly instructed the jury on common-enterprise liability;

4. Whether the jury verdict was supported by material evidence; and

5. Whether the State should be awarded attorneys' fees on appeal.

For the following reasons, we affirm the decision of the trial court and remand for further proceedings consistent with this opinion.

### III.  STANDARD OF REVIEW

On appeal, "our review of a jury's factual findings in a civil action is limited to determining whether any material evidence supported the verdict." *Potter v. Ford Motor Co.*, 213 S.W.3d 264, 268 (Tenn. Ct. App. 2006) (citing *In re Estate of Brindley*, No. M1999-02224-COA-R3-CV, 2002 WL 1827578, at *2 (Tenn. Ct. App. Aug. 7, 2002); Tenn. R. App. P. 13(d)). We "do not determine the credibility of witnesses or weigh evidence on appeal from a jury verdict." *Id.* at 268-69 (citing *In re Estate of Brindley*, 2002 WL 1827578, at *2; *Conatser v. Clarksville Coca-Cola Bottling Co.*, 920 S.W.2d 646, 647 (Tenn. 1995); *Benson v. Tennessee Valley Elec. Coop.*, 868 S.W.2d 630, 638-39 (Tenn. Ct. App. 1993)). "Where the record contains material evidence supporting the verdict, the judgment based on that verdict will not be disturbed on appeal." *Id.* at 269 (citing *Reynolds v. Ozark Motor Lines, Inc.*, 887 S.W.2d 822, 823 (Tenn. 1994); *Whaley v. Rheem Mfg. Co.*, 900 S.W.2d 296, 300 (Tenn. Ct. App. 1995)). Additionally, we review questions of law *de novo* with no presumption of correctness accorded to the trial court's conclusions of law. *Eberbach v. Eberbach*, 535 S.W.3d 467, 473 (Tenn. 2017) (citing *Barnes v. Barnes*, 193

S.W.3d 495, 498 (Tenn. 2006); *Taylor v. Fezell*, 158 S.W.3d 352, 357 (Tenn. 2005)).

## IV.  DISCUSSION

At the outset of this discussion, we observe that "[a]ttorneys are trusted by the community with the care of their lives, liberty and property with no other security than personal honor and integrity." *Schoolfield v. Tenn. Bar Ass'n*, 353 S.W.2d 401, 404 (Tenn. 1961).  Consequently, due in part to the level of trust required, the path to the practice of law is justifiably a rigorous one:

> The practice of law is not a business open to all, but a personal right, limited to a few persons of good moral character, with special qualifications ascertained and certified after a long course of study, both general and professional, and a thorough examination by a state board appointed for the purpose.  The right to practice law is in the nature of a franchise from the state conferred only for merit.  It cannot be assigned or inherited, but must be earned by hard study and good conduct.  It is attested by a certificate of the Supreme Court, and is protected by registration.  No one can practice law unless he has taken an oath of office and has become an officer of the court, subject to its discipline, liable to punishment for contempt in violating his duties as such, and to suspension or removal.

*Union City & Obion Cnty. Bar Ass'n v. Waddell*, 205 S.W.2d 573, 579 (Tenn. Ct. App. 1947) (quoting *State v. Retail Credit Men's Ass'n of Chattanooga*, 43 S.W.2d 918, 921 (Tenn. 1931)).  It follows then that the practice of law "is not a lawful business except for members of the bar who have complied with all the conditions required by statute and the rules of the courts." *Id.* (quoting *Retail Credit Men's Ass'n of Chattanooga*, 43 S.W.2d at 921.

Accordingly, "Tennessee has a clear public policy prohibiting persons who are not licensed attorneys to engage in the unauthorized practice of law." *Northcutt v. Northcutt*, No. M2006-00295-COA-R3-CV, 2007 WL 3332851, at *3 (Tenn. Ct. App. Nov. 8, 2007) (citing Tenn. Code Ann. § 23-3-103; *Petition of Burson*, 909 S.W.2d 768, 776 (Tenn. 1995)).  The reasons for this policy are that "[p]ermitting persons who are not trained in the law to advise clients with regard to legal matters endangers the personal and property rights of the public and interferes with the administration of justice." *Id.* (citing *Bar Ass'n of Tenn., Inc. v. Union Planters Title Guar. Co.*, 326 S.W.2d 767, 779 (Tenn. Ct. App. 1959)); *see Fifteenth Judicial Dist. Unified Bar Ass'n v. Glasgow*, No. M1996-00020-COA-R3-CV, 1999 WL 1128847, at *6 (Tenn. Ct. App. Dec. 10, 1999) ("The practice of law by untrained persons endangers the public's personal and property rights, as well as the orderly administration of the judicial system.").

The ultimate authority to define, regulate, and control the practice of law in

Tennessee belongs to the Tennessee Supreme Court. *Estate of Green v. Carthage General Hosp., Inc.*, 246 S.W.3d 582, 585 (Tenn. Ct. App. 2007) (citing *Petition of Burson*, 909 S.W.2d at 773-74). Moreover, the Tennessee Supreme Court "possesses not only the inherent supervisory power to regulate the practice of law, but also the corollary power to prevent the unauthorized practice of law." *Petition of Burson*, 909 S.W.2d at 773. The answer to the question of "[w]hat constitutes the practice of law, or conversely the unauthorized practice of law," is one that "is not always easily ascertainable." *Tennessee Env't Council, Inc. v. Tennessee Water Quality Control Bd.*, 254 S.W.3d 396, 403 (Tenn. Ct. App. 2007). Yet, the "Court has made clear that the appropriate standard for determining whether a particular action constitutes the practice of law is whether the acts in question require 'the professional judgment of a lawyer.'" *Estate of Green*, 246 S.W.3d at 585 (citing *Petition of Burson*, 909 S.W.2d at 776). The standard adopted by the Tennessee Supreme Court is as follows:

> Functionally the practice of law relates to the rendition of services for others that call for the professional judgment of a lawyer. The essence of the professional judgment of the lawyer is his educated ability to relate the general body and philosophy of law to a specific legal problem of a client; and thus, the public interest will be better served if only lawyers are permitted to act in matters involving professional judgment. Where this professional judgment is not involved, non-lawyers, such as court clerks, police officers, abstracters, and many governmental employees, may engage in occupations that require a special knowledge of law in certain areas. But the services of a lawyer are essential in the public interest *whenever the exercise of professional legal judgment is required*.

*Tennessee Env't Council*, 254 S.W.3d at 403 (quoting *Petition of Burson*, 909 S.W.2d at 775).[3] As such, our Supreme Court has explained that an act performed by a nonlawyer constitutes the unauthorized practice of law only if the doing of the act requires "the professional judgment of a lawyer." *Petition of Burson*, 909 S.W.2d at 776. Stated differently, whenever the exercise of professional legal judgment is required, a nonlawyer who ventures to offer legal assistance to members of the public crosses the line into the unauthorized practice of law. *State v. Trotter*, No. E2018-00390-COA-R3-CV, 2019 WL 354969, at *9 (Tenn. Ct. App. Jan. 28, 2019).

### A. Subject Matter Jurisdiction

There are several issues raised on appeal, but we first address the issue concerning

---

[3] "The Code of Professional Responsibility was replaced by the Rules of Professional Conduct, and there is no comment equivalent to Ethical Consideration 3-5 in the new Rules; nevertheless, the changes do not affect the standard to be applied." *Tennessee Env't Council*, 254 S.W.3d at 403 n.7; *see Estate of Green*, 246 S.W.3d at 585.

subject matter jurisdiction. "[S]ubject matter jurisdiction is a threshold inquiry, which may be raised at any time in any court." *Johnson v. Hopkins*, 432 S.W.3d 840, 844 (Tenn. 2013) (citing *In re Estate of Trigg*, 368 S.W.3d 483, 489 (Tenn. 2012)). It "involves the court's lawful authority to adjudicate a controversy brought before it." *Id.* at 843 (citing *Chapman v. DaVita, Inc.*, 380 S.W.3d 710, 712 (Tenn. 2012); *Meighan v. U.S. Sprint Commc'ns Co.*, 924 S.W.2d 632, 639 (Tenn. 1996)). It "is conferred by statute or the Tennessee Constitution," and thus "the parties cannot confer it by appearance, plea, consent, silence, or waiver." *Id.* at 843-44 (citing *In re Estate of Trigg*, 368 S.W.3d at 489). "A determination of subject matter jurisdiction involves questions of law; therefore, rulings on such questions are reviewed de novo on appeal, without any presumption of correctness." *Id.* at 844 (citing *In re Estate of Trigg*, 368 S.W.3d at 489). Here, the existence of subject matter jurisdiction depends upon the construction of a statute. "Statutory construction is also a question of law to which de novo review applies on appeal." *Id.* (citing *Mills v. Fulmarque, Inc.*, 360 S.W.3d 362, 366 (Tenn. 2012); *Lind v. Beaman Dodge, Inc.*, 356 S.W.3d 889, 895 (Tenn. 2011)).

Defendants contend that the court lacked subject matter jurisdiction—specifically what they characterize as "subject matter competence"—to entertain the State's complaint against the Firm and Mr. Witherspoon "before the Tennessee Board of Professional Responsibility first had an opportunity to review the State's complaint against them." However, the State contends that this case was not about regulating the conduct of a lawyer practicing law—it was about nonlawyers engaging in "law business" in Tennessee without a Tennessee law license, i.e., the unauthorized practice of law and the responsibility of those persons directing the nonlawyers. Defendants imply that the State's claims were grounded in the Rules of Professional Conduct. However, the State asserts that its claims against Defendants were grounded in statute.

The Tennessee Supreme Court "bears the ultimate responsibility for enforcing the Rules of Professional Responsibility and the ultimate disciplinary responsibility for violations of the ethical rules governing attorneys practicing in Tennessee." *Bd. of Prof'l Responsibility v. Parrish*, 556 S.W.3d 153, 162 (Tenn. 2018) (citing *Garland v. Bd. of Prof'l Responsibility*, 536 S.W.3d 811, 816 (Tenn. 2017); *Sneed v. Bd. of Prof'l Responsibility*, 301 S.W.3d 603, 612 (Tenn. 2010)). Yet, this case does not involve any allegations that Defendants violated the Rules of Professional Conduct. Nowhere in the State's amended complaint does it allege that Defendants violated the Rules of Professional Conduct; it only alleges violations under the UPL Statute and the TCPA.[4] That is because the State's allegations involve nonlawyers engaging in the unauthorized practice of law.

---

[4] The State's original complaint contained the following language which referenced the Rules of Professional Conduct and which inferred the Rules did not apply in this case: "By soliciting consumers in Tennessee . . . to provide legal services or legal representations when none of the Defendants are licensed to practice law in Tennessee—and if they were, such conduct would violate the Tennessee Rules of Professional Conduct—Defendants have engaged in unfair conduct in violation of the TCPA."

- 11 -

Pursuant to the UPL Statute, i.e., Tennessee Code Annotated section 23-3-101, *et seq.*, which is at issue in this case, "[t]he General Assembly has provided a penalty for the unauthorized practice of law." *Petition of Burson*, 909 S.W.2d at 776. Our Supreme Court has recognized that this legislation is not an infringement upon its constitutional and inherent responsibilities but rather an aid to its inherent power. *Id.* The UPL Statute provides as follows:

(a) No person shall engage in the *practice of law* or do *law business*, or both, *as defined in § 23-3-101*, unless the person has been duly licensed and while the person's license is in full force and effect, nor shall any association or corporation engage in the practice of the law or do law business, or both. However, nonresident attorneys associated with attorneys in this state in any case pending in this state who do not practice regularly in this state shall be allowed, as a matter of courtesy, to appear in the case in which they may be thus employed without procuring a license, if properly authorized in accordance with applicable rules of court, and when introduced to the court by a member in good standing of the Tennessee bar, if all the courts of the resident state of the nonresident attorney grant a similar courtesy to attorneys licensed in this state.

(b) Any person who violates the prohibition in subsection (a) commits a Class A misdemeanor.

Tenn. Code Ann. 23-3-103(a) and (b) (emphasis added). Additionally, "[i]t is unlawful for any person, either directly or indirectly, falsely to advertise the person as, or hold the person out as, a lawyer." Tenn. Code Ann. § 23-3-108(a). "[T]he purpose of the statutory prohibition against the unauthorized practice of law protects the public by ensuring that the public receives high quality legal services." *Glasgow*, 1999 WL 1128847, at *6; *see Petition of Burson*, 909 S.W.2d at 776-77; *Haverty Furniture Co. v. Foust*, 124 S.W.2d 694, 697 (Tenn. 1939). Equally so, it prevents "'the public from being preyed upon by those who . . . seek to perform services which require skill, training and character, without adequate qualifications.'" *Waddell*, 205 S.W.2d at 579 (quoting *Foust*, 124 S.W.2d at 698). We emphasize that "this statute does not prohibit the conduct of practicing law altogether, rather, it only prohibits the practice of law without a license." *Fitzpatrick v. Law Solutions Chicago, LLC*, 584 B.R. 203, 224 (Bankr. E.D. Tenn. 2018).

In regard to "law business" and the "practice of law," the UPL Statute defines those terms as follows:

(1) "Law business" means the advising or counseling for valuable consideration of any person as to any secular law, the drawing or procuring of or assisting in the drawing for valuable consideration of any paper, document or instrument affecting or relating to secular rights, the doing of

any act for valuable consideration in a representative capacity, obtaining or tending to secure for any person any property or property rights whatsoever, or *the soliciting of clients directly or indirectly to provide such services*;

. . .

(3) "Practice of law" means the appearance as an advocate in a representative capacity or the drawing of papers, pleadings or documents or the performance of any act in such capacity in connection with proceedings pending or prospective before any court, commissioner, referee or any body, board, committee or commission constituted by law or having authority to settle controversies, or *the soliciting of clients directly or indirectly to provide such services*.

Tenn. Code Ann. § 23-3-101 (emphasis added). Our Supreme Court has explained that these definitions must be read in conjunction with the Rules of Professional Conduct. *Petition of Burson*, 909 S.W.2d at 776. In doing so, as previously discussed, the result is that "the acts enumerated in the definitions of 'law business' and 'practice of law' . . . , if performed by a non-attorney[,] constitute the unauthorized practice of law only if the doing of those acts requires 'the professional judgment of a lawyer.'" *Id.* In the case at bar, the State claimed that Mr. McClendon and Mr. Smith, who were nonlawyers, solicited clients in Tennessee and that Mr. McClendon held himself out as a lawyer.[5] The soliciting of clients is included within the UPL Statute's definition of both "law business" and the "practice of law." *See* Tenn. Code Ann. § 23-3-101(1) and (3). Moreover, the prohibition against a person falsely advertising or holding himself out as a lawyer is included within the UPL Statute. *See* Tenn. Code § 23-3-108. Additionally, both Mr. McClendon and Mr. Smith allegedly made statements about how much money could be obtained from settlement proceeds while they were soliciting these clients. Such statements about settlement proceeds required "the professional judgment of a lawyer." *Petition of Burson*, 909 S.W.2d at 776. Thus, the State's claims are indeed grounded in statute.

In addition to the definitions provided by the UPL Statute, Tennessee Code Annotated section 23-3-103 authorizes the Attorney General to "bring an action in the name of the state" in "a court of competent jurisdiction" when a person violates the prohibition against the unauthorized practice of law. Tenn. Code Ann. § 23-3-103(c)(1) and (2). In April 2017, the Attorney General, on behalf of the State, filed its original complaint against Defendants in chancery court. "The chancery court has concurrent jurisdiction, with the circuit court, of all civil causes of action . . . except for unliquidated damages for injuries to person or character, and except for unliquidated damages for injuries to property not resulting from a breach of oral or written contract . . . ." Tenn.

---

[5] As stated before, the State conceded and nonsuited the claim as to Mr. Smith for a violation of Tennessee Code Annotated section 23-3-108, i.e., holding himself out as a lawyer.

Code Ann. § 16-11-102(a).  Likewise, the TCPA, Tennessee Code Annotated section 47-18-101, *et. seq.*, which is also at issue in this case, authorizes the Attorney General to "bring an action in the name of the state" in "a court of competent jurisdiction" when a person engages in any act or practice declared unlawful by the Act.  Tenn. Code Ann. § 47-18-108(a)(1) and (4); *see also* Tenn. Code Ann. § 47-18-114 ("The attorney general may bring any appropriate action or proceeding in any court of competent jurisdiction pursuant to this part.").  Again, we reiterate that "[t]he chancery court has concurrent jurisdiction, with the circuit court, of all civil causes of action . . . except for unliquidated damages for injuries to person or character, and except for unliquidated damages for injuries to property not resulting from a breach of oral or written contract . . . ."  Tenn. Code Ann. § 16-11-102(a).

For these reasons, we find that the chancery court was a court of competent jurisdiction to hear the State's claims pursuant to both the UPL Statute and the TCPA.  Therefore, we conclude that the chancery court properly exercised subject matter jurisdiction in this case.

## B.  Exclusion of Evidence

Defendants next present the issue of whether the trial court erred when it denied Mr. Witherspoon the right to temporarily practice law in Tennessee without allowing him the benefit of RPC 5.5(c)(2) as authorized by the Tennessee Supreme Court, when the unauthorized practice of law is criminal or quasi-criminal.  Their statement of this issue in their appellate brief does not reference an error in the exclusion of evidence.  However, they devote their argument section for this issue to the contention that the trial court erred when it ruled RPC 5.5 was not relevant to the defense of an out-of-state attorney charged with the unauthorized practice of law in Tennessee and Defendants could not present evidence demonstrating their compliance with RPC 5.5.  The State asserts that Defendants waived this issue by failing to properly preserve it in the trial court.  Alternatively, the State argues that the trial court did not abuse its discretion in striking this defense and excluding any evidence pertaining to it.

Prior to trial, in the context of an order resolving a motion in limine, the trial court struck Defendants' RPC 5.5 defense and excluded any evidence pertaining to it, finding that it was not relevant.  Specifically, the trial court held:

> Defendants are prohibited from introducing any evidence or argument regarding alleged compliance with [RPC] 5.5 regarding the multijurisdictional practice of law.  Defendants' affirmative defense alleges that Defendants were in compliance with [RPC] 5.5(c).  The Court finds that this is not a viable affirmative defense . . . .  Furthermore, the Court finds that any evidence regarding Defendants' compliance with [RPC] 5.5, including evidence about Defendants' expectations of admission and other lawyers they may have known or associated with in Tennessee, is not relevant to this

- 14 -

case.

Decisions regarding the admissibility of evidence are within the discretion of the trial court. Tenn. R. Evid. 104(a). Therefore, "[i]ssues regarding admission of evidence in Tennessee are reviewed for abuse of discretion." *Merrell v. City of Memphis*, No. W2013-00948-COA-R3-CV, 2014 WL 173411, at *8 (Tenn. Ct. App. Jan. 16, 2014) (citing *Dickey v. McCord*, 63 S.W.3d 714, 723 (Tenn. Ct. App. 2001)). On this issue, this Court has held as follows:

> An appellate court will not reverse a trial court's exercise of discretion in ruling on an evidentiary motion in limine unless there is an abuse of the wide discretion given the trial court on evidentiary matters. *Pullum v. Robinette*, 174 S.W.3d 124, 137 (Tenn. Ct. App. 2004) (citing *Heath v. Memphis Radiological Prof'l Corp.*, 79 S.W.3d 550 (Tenn. Ct. App. 2002)).
>
> . . .
>
> When arriving at a determination to admit or exclude evidence, trial courts are generally "accorded a wide degree of latitude and will only be overturned on appeal where there is a showing of abuse of discretion." *Otis v. Cambridge Mut. Fire Ins. Co.*, 850 S.W.2d 439, 442 (Tenn. 1993) (citing *Strickland v. City of Lawrenceburg*, 611 S.W.2d 832 (Tenn. Ct. App. 1980); Tenn. R. Evid. 401; *Austin v. City of Memphis*, 684 S.W.2d 624 (Tenn. Ct. App. 1984); *Inman v. Aluminum Co. of America*, 697 S.W.2d 350 (Tenn. Ct. App. 1985)). Error may not be predicated upon a ruling which admits or excludes evidence unless a substantial right of the party is affected. Tenn. R. Evid. 103.

*Brandy Hills Ests., LLC v. Reeves*, 237 S.W.3d 307, 317-18 (Tenn. Ct. App. 2006). "When reviewing a discretionary decision by the trial court, the 'appellate courts should begin with the presumption that the decision is correct and should review the evidence in the light most favorable to the decision.'" *Merrell*, 2014 WL 173411, at *8 (quoting *Overstreet v. Shoney's, Inc.*, 4 S.W.3d 694, 709 (Tenn. Ct. App. 1999)).

*i.* *Waiver*

We must first consider whether this particular issue has been waived. In a case tried by a jury, it is well-settled in Tennessee that "in order to preserve errors for appeal, the appellant must first bring the alleged error to the attention of the trial court in a motion for a new trial." *Fahey v. Eldridge*, 46 S.W.3d 138, 141 (Tenn. 2001); *see Memphis St. Ry. Co. v. Johnson*, 88 S.W. 169, 170 (1905). Pursuant to Tennessee Rule of Appellate Procedure 3(e), a motion for a new trial must be filed in a case tried by a jury in order to properly preserve certain errors for appeal:

- 15 -

> [*I*]*n all cases tried by a jury*, no issue presented for review [on appeal] shall be predicated upon error in the admission or exclusion of evidence, jury instruction granted or refused, misconduct of jurors, parties or counsel, or other action committed or occurring during the trial of the case, or other ground upon which a new trial is sought, unless the same was specifically stated in a *motion for a new trial*; otherwise such issues will be treated as waived.

Tenn. R. App. P. 3(e) (emphasis added).[6] We note that "the 'catch-all' language of the rule ('or other ground upon which a new trial is sought') encompasses other alleged errors in connection with a trial." *In re Mitchell v. Davis*, No. 03A019409CH-00317, 1995 WL 546928, at *1 (Tenn. Ct. App. Sept. 15, 1995). Furthermore, the Advisory Commission Comment for subdivision (e) provides that "matters that can only be made a part of the record by a new trial motion must be so included in order to gain appellate review." Tenn. R. App. P. 3, Advisory Comm'n Comment, Subdivision (e). In addition to filing a motion for a new trial, the grounds upon which a motion for new trial is sought must be "specifically stated" in the motion. *Fahey*, 46 S.W.3d at 142; *see* Tenn. R. App. R. 3(e). The motion for a new trial "should contain a concise factual statement of the error 'sufficient to direct the attention of the court and the prevailing party to it.'" *Id.* (quoting *Memphis St. Ry. Co.*, 88 S.W. at 170-71).

The reason for this rule requiring a motion for a new trial is twofold. First, our Supreme Court initially imposed this requirement "to make more efficient the process of reviewing 'the ever[-]increasing number of appeals' . . . ." *Id.* at 141-42. Thus, a motion for a new trial "significantly aids the functions of the appellate courts by limiting and defining the issues for review." *Id.* at 142; *see Bd. of Equalization v. Nashville, C. & St. L. Ry.*, 257 S.W. 91, 93 (1923) (noting that the Tennessee Supreme Court "was constrained to exercise its power of prescribing rules of practice, requiring that error be first assigned in a motion for new trial presented to the trial court, and . . . limiting the inquiry on appeal to error assigned in the motion"). Second, and perhaps most importantly, a motion for a new trial "help[s] to ensure that 'the trial judge might be given an opportunity to consider or reconsider alleged errors committed during the course of the trial or other matters affecting the jury or the verdict . . . .'" *Id.* (quoting *McCormic v. Smith*, 659 S.W.2d 804, 806 (Tenn.1983)). This serves to avoid "appeal by ambush." *Mason v. Tennessee Farmers Mut. Ins. Co.*, 640 S.W.2d 561, 563 (Tenn. Ct. App. 1982). Therefore, our Supreme Court has explained, "[i]n all civil cases tried to a jury, any ground not cited in the motion for new trial has been waived for the purposes of appeal." *Waters v. Coker*, 229 S.W.3d 682,

---

[6] We note that the prevailing party in the trial court is not required to file a motion for new trial in order to preserve the opportunity to raise an issue in a cross-appeal. *Milan Supply Chain Sols., Inc. v. Navistar, Inc.*, 627 S.W.3d 125, 156 (Tenn. 2021); *see* Tenn. R. App. P. 3(e), 2000 Advisory Comm'n Comment ("The third sentence of Rule 3(e) does not bar an appellee who failed to move for a new trial from raising issues on appeal under Rule 13(a).").

689 (Tenn. 2007) (citing *Boyd v. Hicks*, 774 S.W.2d 622, 625 (Tenn. Ct. App. 1989)).

In the case at bar, Defendants moved for a directed verdict on several issues regarding the UPL Statute and the TCPA on the third day of trial. The trial court denied Defendants' motion finding that the State had made its case. After trial, Defendants filed a "Motion to Alter or Amend or to Grant a Directed Verdict or Judgment Notwithstanding Verdict," in which they raised several issues: (1) the trial court lacked subject matter jurisdiction; (2) the trial court denied Defendants the right to present any evidence on RPC 5; (3) the trial court failed to include proper jury instructions; (4) the record lacked evidence to support a claim under the UPL Statute or the TCPA regarding Mr. Jones, Mrs. Jones, or Ms. Wilson; and (5) there was no vicarious liability regarding independent contractors. In their memorandum in support of the motion, Defendants cited to case law in their standard of review supporting a Rule 59.04 motion to alter or amend. They also requested that the trial court "reconsider its ruling and grant a directed verdict or refer this matter to proper venue." Defendants failed to file a "Motion for a New Trial," or at least one titled as such, in compliance with Tennessee Rule of Appellate Procedure 3(e), and their motion did not request a new trial either.

Our Supreme Court has observed that litigants do not always file model motions "when seeking to bring alleged errors to the attention of a trial court or preserve those alleged errors for appeal." *Fahey*, 46 S.W.3d at 144. Accordingly, "appellate courts should not lightly dismiss an issue on appeal under a strict or technical application of Rule 3(e)." *Id.* at 143-44. Instead, when reviewing a motion for a new trial, appellate courts

> should view the motion in the light most favorable to the appellant, and it should resolve any doubt as to whether the issue and its grounds were specifically stated in favor of preserving the issue. Any other method of review would result in needlessly favoring "technicality in form" over substance, a practice specifically discouraged by the comments to Rule 1.

*Id.* at 143; *see* Tenn. R. App. P. 1, Advisory Comm'n Comment ("[I]t is the policy of these rules to disregard technicality in form in order that a just, speedy, and inexpensive determination of every appellate proceeding on its merits may be obtained."). "[A]llowing the form of a motion to control could result in the dismissal of many appeals and would, in turn, defeat the mandate of Rule 1 . . . ." *Tennessee Farmers Mut. Ins. Co. v. Farmer*, 970 S.W.2d 453, 455 (Tenn. 1998). Thus, "a court must look to the substance of the motion rather than to the motion's title." *Parigin v. Mills*, No. E2016-00640-COA-R3-CV, 2017 1032740, at *5 (Tenn. Ct. App. Mar. 16, 2017) (citing *Farmer*, 970 S.W.2d at 455). For instance, our Supreme Court has construed a "Motion to Set Aside Decree and Restore the Cause to the Docket" as a motion for a new trial based on the motion's substance. *Bemis Co., Inc. v. Hines*, 585 S.W.2d 574, 575 (Tenn. 1979).[7] Nevertheless, we keep in mind that

---

[7] We note, however, that the *Bemis* case was handed down on July 30, 1979, which was less than a

"the decision in *Fahey* does not excuse litigants from the requirements of Rule 3(e), nor does it require this Court to consider issues that simply were not preserved for appellate review." *Hatfield v. Allenbrooke Nursing and Rehabilitation Ctr., LLC*, No. W2017-00957-COA-R3-CV, 2018 WL 3740565, at *20 (Tenn. Ct. App. Aug. 6, 2018).

The trial court was in a similar predicament as this Court when addressing Defendants' motion, which required it to look at the substance of the motion. In its order denying Defendants' motion, it stated as follows:

> Defendants titled their motion a "Motion to Alter or Amend." Although Tennessee courts are not bound by the titles of pleadings and motions, it appears that the substance of the Defendants' motion, according to the relief sought, is a Rule 59.04 motion. *Ferguson v. Brown*, 291 S.W.3d 381, 387 (Tenn. Ct. App. 2008). As such this Court will treat the motion as a motion to alter or amend.

The trial court then addressed four of the five issues in Defendants' motion, which included the issue regarding RPC 5, under what it determined was a Rule 59.04 motion to alter or amend. While Defendants' motion was partly titled "Motion to Alter or Amend," it also included in its title, "or to Grant a Directed Verdict or Judgment Notwithstanding Verdict." Therefore, the trial court determined one of the issues raised in the Defendants' motion came "under the guise of a motion for JNOV."[8] Ultimately, the trial court denied both the motion to alter or amend and the motion for judgment notwithstanding the verdict.

In *Cortez v. Alutech, Inc.*, 941 S.W.2d 891, 894 (Tenn. Ct. App. 1996), a case tried before a jury, we explained that a motion for a new trial is "not necessarily warranted in all cases wherein review by this Court is sought."[9] Yet, we noted that a motion for a new trial is "a prerequisite to appellate review in certain cases, in accordance with Rule 3(e) . . . ." *Id.* That is, in cases tried before a jury, when a party wishes to preserve the particular issues set forth in Rule 3(e), such as an error in the admission or exclusion of evidence. *See* Tenn. R. App. P. 3(e). We opine that such is the case here because the effect of this Court ruling that the trial court erred in the exclusion of any evidence regarding RPC 5.5 would be to vacate and remand for a new trial.

---

month after the Tennessee Rules of Appellate Procedure became effective on July 1, 1979. The case was a non-jury workmen's compensation matter and did not apply or cite any of the Tennessee Rules of Appellate Procedure.

[8] That particular issue was whether the record lacked evidence to support a claim under the UPL Statute or the TCPA regarding Mr. Jones, Mrs. Jones, or Ms. Wilson. The trial court applied the legal standard for a Rule 50.02 motion.

[9] We further explained that "[t]he argument that a motion for a new trial is necessary for review of a trial court's refusal to grant a directed verdict was expressly rejected by [this Court] in *Rupe v. Durbin Durco, Inc.*, 557 S.W.2d 742 (Tenn. Ct. App. 1976), overruled on other grounds, *Crosslin v. Alsup*, 594 S.W2d 379 (Tenn. 1980)." *Cortez*, 941 S.W.2d at 894.

- 18 -

At this juncture, we must mention that this Court has addressed this issue before in a similar case. *See Johnson v. Ford*, No. E2011-00486-COA-R3-CV, 2012 WL 1253269, at \*10 (Tenn. Ct. App. Apr. 12, 2012). In that case, which was tried by a jury, the plaintiffs filed a motion for judgment notwithstanding the verdict or to alter or amend. *Id.* at \*7. Afterward, the plaintiffs appealed to this Court and raised seven issues for appellate review. *Id.* at \*7-8. We determined that two of those issues were subject to Tennessee Rule of Appellate Procedure 3(e). *Id.* at \*10. We stated that "[a]lthough Plaintiffs' post-trial motion was not styled as a motion for new trial, *in substance* it attempted to attack the jury's verdict by alleging that it was not supported by the evidence." *Id.* (emphasis added). Therefore, upon examining the substance of the motion, we erred on the side of caution and treated the plaintiffs' post-trial motion as a motion for a new trial. *Id.*; *see Farmer*, 970 S.W.2d at 455 ("[W]e hold that when determining whether a post-trial motion is one of those designated by the rules of civil and appellate procedure as tolling commencement of the time for filing a notice of appeal, the court must consider the substance of the motion, rather than its form."). Ultimately, however, we concluded that those two issues were still waived because they were not "specifically stated" in the motion. *Id.* at \*11; s*ee also Chilton v. Austin*, No. M2001-02891-COA-R3-CV, 2003 WL 237365, at \*3 (Tenn. Ct. App. Feb. 4, 2003) (noting that the appellant "did not make a motion for a new trial" but "did, however, include in his post-trial motion a request that the court alter or amend the verdict and the substance of the motion is an attack on the verdict because it was not supported by the evidence," and therefore, "[w]e will treat the motion as a motion for a new trial").

With all of this in mind, we have reviewed the substance of Defendants' motion. Defendants did not request a new trial in their motion or in their memorandum in support of the motion. They only requested that the trial court "reconsider its ruling and grant a directed verdict or refer this matter to proper venue." Furthermore, they did not request that the trial court "weigh the evidence or determine the preponderance of the evidence." *Mairose v. Federal Exp. Corp.*, 86 S.W.3d 502, 511 (Tenn. Ct. App. 2001) (citation omitted). Thus, the trial court did not apply the "thirteenth juror" standard for a motion for a new trial. *See* Tenn. R. Civ. P. 59.06, Advisory Comm'n Comment to 1991 Amendment. Instead, the trial court applied the Rule 59.04 standard for a motion to alter or amend and the Rule 50.02 standard for a motion for a directed verdict or judgment notwithstanding the verdict. We reiterate that the trial court reached this result because it too examined the substance of Defendants' motion. However, we again note that the effect of this Court ruling that the trial court erred in the exclusion of any evidence regarding RPC 5.5 would be to vacate and remand for a new trial. Therefore, in substance, Defendants gave the trial court the opportunity to correct an error that, if true, would require the remedy of a new trial. Courts are not bound by titles and have the discretion to treat a pleading or a motion according to the relief sought. *Ferguson*, 291 S.W.3d at 387. Following the approach used in *Johnson v. Ford*, we choose to err on the side of caution and treat Defendants' post-trial motion as a motion for a new trial for the purposes of Rule 3(e). "Rule 3(e) looks to the

substance and not to the technical form or wording of the motion." *Fahey*, 46 S.W.3d at 144 n.8; *see also Waters v. Coker*, 229 S.W.3d 682, 689 (Tenn. 2007) ("Although appellate courts should view a motion for new trial in the light most likely to consider a specific question, the preservation of the issue in some form is essential for review.") Defendants presented this particular issue in their post-trial motion as "The Court Denied the Defendants the Right to Present Any Evidence on Tenn. Sup. Ct. R. 8, RPC 5." We find that they specifically stated this issue in that motion in order to properly preserve it for appellate review. *See* Tenn. R. App. P. 3(e). Accordingly, we conclude that this issue has not been waived.

### *ii.* *RPC 5.5*

In its order denying Defendants' post-trial motion, the trial court addressed whether Defendants were improperly denied the right to present any evidence regarding RPC 5. That issue appears to correspond with Defendants' issue on appeal, which specifically concerns RPC 5.5(c)(2). The trial court noted that it had previously ruled on this issue when it entered an order granting the State's motion in limine and striking Defendants' defense. It again explained that Rule 5.5(c)(2) could not be an affirmative defense to solicitation for the following reasons:

> [The] affirmative defense admits the truth of the averments of the complaint, but states that for some other reason the defendant is not liable. Thus[,] if the Defendants admit the truth of the allegations in the State's Complaint, then the Defendants would be admitting that while not licensed to practice in Tennessee, they still solicited Tennessee Consumers. As such, Defendants would be admitting they violated T.C.A. 23-3-101. Therefor[e] this Court ruled that [RPC] 5.5.(c) cannot be a defense to the State's allegations of solicitation without a Tennessee law license.

Furthermore, it explained that evidence of Mr. Witherpoon's reasonable expectation of temporarily practicing law in Tennessee was irrelevant because he still could not solicit in Tennessee without a Tennessee law license. Thus, the trial court concluded that Defendants were again relitigating matters that it had previously adjudicated and that Defendants' motion to alter or amend on this issue was not well-taken.

Central to this issue is Tennessee Supreme Court Rule 8, RPC 5.5, which provides in pertinent part as follows:

> (c) A lawyer admitted in another United States jurisdiction, and not disbarred or suspended from practice in any jurisdiction, may provide legal services on a temporary basis in this jurisdiction that:
>
> . . .

(2) are in or reasonably related to a pending or potential proceeding before a tribunal in this or another jurisdiction, if the lawyer, or a person the lawyer is assisting, is authorized by law or order to appear in such proceeding or reasonably expects to be so authorized;

Tenn. Sup. Ct. R. 8, RPC 5.5(c)(2). Significantly, one of the comments pertaining to this rule states that paragraph (c) does "not authorize communications advertising legal services in this jurisdiction by lawyers who are admitted to practice in other jurisdictions. Whether and how lawyers may communicate the availability of their services in this jurisdiction is governed by RPCs 7.1 to 7.5." Tenn. Sup. Ct. R. 8, RPC 5.5, Comment 21.[10]

During his proffered testimony, Mr. Witherspoon testified that he was very familiar with the rules regarding the multi-jurisdictional practice of law. Yet, he cannot utilize Rule 5.5(c)(2) as a defense that would enable him to solicit clients in Tennessee. As previously discussed, the State's allegations in this case were that two nonlawyers, Mr. McClendon and Mr. Smith, solicited clients in Tennessee and that Mr. McClendon held himself out as a lawyer. Mr. Witherspoon admitted that he was aware of Mr. McClendon's and Mr. Smith's activities in Tennessee. While Mr. Witherspoon may have had a reasonable expectation to be authorized to practice law in Tennessee on a temporary basis, he admitted that he did not have a license to practice law in Tennessee.

We reiterate that this Court "will not reverse a trial court's exercise of discretion in ruling on an evidentiary motion in limine unless there is an abuse of the wide discretion given the trial court on evidentiary matters." *Reeves*, 237 S.W.3d at 317 (quoting *Pullum*, 174 S.W.3d at 137) (citation omitted). Applying that standard, we conclude that the trial court did not abuse its discretion in excluding evidence regarding RPC 5.5.

### C. Vicarious Liability

Defendants also present the issue of whether the trial court erred when it determined that Mr. Witherspoon and the Firm were vicariously liable for the conduct of independent contractors. They argue that Mr. Witherspoon and the Firm cannot be held liable for any acts or failures to act by Mr. McClendon or Mr. Smith. In their argument section for this issue, they assert that the trial court's jury instruction under the common-enterprise doctrine was improper for two reasons: (1) Mr. Witherspoon and the Firm were not responsible for the actions of Mr. McClendon and Mr. Smith, who were independent contractors, where there was no negligence for which they could be held accountable; and

---

[10] RPC 7.3 governs the solicitation of clients and defines a solicitation as "a targeted communication initiated by or on behalf of a lawyer that is directed to a specific person and that offers to provide, or reasonably can be understood as offering to provide, legal services for a particular matter." Tenn. Sup. Ct. R. 8, RPC 7.3(a).

(2) there was no evidence that either Ms. Nash or Ms. Myers was harmed by any tortious conduct and no evidence that Ms. Nash was deceived or misled by any representations that Mr. McClendon might have made. However, Defendants' statement of this issue in their appellate brief does not specifically reference an error in the jury instructions. The State contends that Defendants waived this issue or that, in the alternative, Defendants' argument lacks merit. As for waiver, the State argues again that Defendants failed to specifically state this issue in a motion for new trial as required by Tennessee Rule of Appellate Procedure 3(e). However, it further argues that Defendants did not even specifically state this issue in their post-trial motion.

For the same reasons discussed in the previous section, we choose to err on the side of caution and treat Defendants' post-trial motion as a motion for a new trial for purposes of Rule 3(e). *See* Tenn. R. App. P. 3(e) ("[N]o issue presented for review shall be predicated upon error in . . . jury instructions granted or refused . . . unless the same was specifically stated in a motion for a new trial[.]"). Still, this particular issue must have been specifically stated in their post-trial motion in order to properly preserve it for appellate review. *See id.* In their motion, Defendants raised issues asserting that "The Court Failed to Include Proper Jury Instructions" and "There is No Vicarious Liability Regarding Independent Contractors." In their memorandum in support of the motion, their argument concerning the error in the jury instructions did not specifically challenge the instruction under the common-enterprise doctrine. Their argument concerning vicarious liability regarding independent contractors also did not specifically challenge the instruction under the common-enterprise doctrine. Instead, they argued that the State failed to establish how Defendants committed a common-enterprise violation and how Mr. Witherspoon and the Firm were vicariously liable for the conduct of Mr. McClendon and Mr. Smith. We reiterate that "[i]n all civil cases tried to a jury, any ground not cited in the motion for new trial has been waived for the purposes of appeal." *Waters*, 229 S.W.3d at 689 (citing *Boyd*, 774 S.W.2d at 625).

Based on their argument section for this issue in their appellate brief, Defendants challenge the jury instruction under the common-enterprise doctrine.[11] Although

___

[11]The Tennessee Supreme Court has explained that "[a]n effectively crafted issue statement will define the question to be considered and begin disposing the court to decide in the client's favor." *Hodge v. Craig*, 382 S.W.3d 325, 334 (Tenn. 2012) (quoting Judith D. Fischer, *Got Issues? An Empirical Study About Framing Them*, 6 J. Ass'n Legal Writing Directors 1, 25 (2009); *see also State v. Williams*, 914 S.W.2d 940, 948 (Tenn. Crim. App. 1995) (stating that "[e]ach issue should . . . relate the conclusion that the party wants the appellate court to reach"); Karl N. Llewellyn, *A Lecture on Appellate Advocacy*, 29 U. Chi. L.Rev. 627, 630 (1962) (stating that "the first thing that comes up is the issue and the first art is the framing of the issue so that if your framing is accepted the case comes out your way")). "Rather than searching for hidden questions, appellate courts prefer to know immediately what questions they are supposed to answer." *Id.* (citing Bryan A. Garner, *Garner on Language and Writing* 115 (2009); Robert L. Stern, *Appellate Practice in the United States* § 10.9, at 263 (2d ed.1989)). Thus, "briefs should 'be oriented toward a statement of the issues presented in a case and the arguments in support thereof.'" *Id.* (quoting Tenn. R. App. P. 27).

Defendants cite to case law for the doctrine of *respondeat superior* and also assert that there was no evidence of harm, their positions come under their argument concerning the jury instruction. Therefore, because Defendants failed to specifically raise this issue in their post-trial motion, we find that they have waived it. *See* Tenn. R. App. P. 3(e).

## D. Material Evidence

We now address the issues in which Defendants challenge the sufficiency of the evidence. Defendants contend that there was not sufficient evidence upon which a jury could have concluded the following: (i) Mr. Smith or Mr. McClendon engaged in impermissible conduct with respect to the Jones and Wilson families in violation of the UPL Statute and the TCPA; (ii) Mr. McClendon engaged in impermissible conduct with respect to the Nash family in violation of the UPL Statute and the TCPA; and (iii) Mr. Smith engaged in impermissible conduct with respect to the Myers family in violation of the UPL Statute and the TCPA. The State asserts that Defendants arguments should be rejected because there was material evidence to support all of the jury's findings.

The Tennessee Supreme Court has explained that "[a]n appellate court shall only set aside findings of fact by a jury in a civil matter if there is no material evidence to support the jury's verdict." *Creech v. Addington*, 281 S.W.3d 363, 372 (Tenn. 2009) (citing Tenn. R. App. 13(d); *Whaley v. Perkins*, 197 S.W.3d 665, 671 (Tenn. 2006)). "In determining whether there is material evidence to support a verdict, we shall: '(1) take the strongest legitimate view of all the evidence in favor of the verdict; (2) assume the truth of all evidence that supports the verdict; (3) allow all reasonable inferences to sustain the verdict; and (4) discard all [countervailing] evidence." *Id.* (quoting *Barnes v. Goodyear Tire & Rubber Co.*, 48 S.W.3d 698, 704 (Tenn. 2000) (citation omitted)). We "shall neither reweigh the evidence nor decide where the preponderance of the evidence lies." *Id.* (quoting *Barnes*, 48 S.W.3d at 704). "If there is any material evidence to support the verdict, we must affirm it; otherwise, the parties would be deprived of their constitutional right to trial by jury." *Id.* (citing *Crabtree Masonry Co. v. C. & R. Constr., Inc.*, 575 S.W.2d 4, 5 (Tenn. 1978)).

### i. The Jones, Nash, and Wilson Families

We first point out that Defendants included Mr. Smith, along with Mr. McClendon, in their argument regarding the Jones and Wilson families. However, the State admits that it did not allege that Mr. Smith committed any unlawful conduct regarding the Jones and Wilson families. Furthermore, the jury verdict forms reflect this. Mr. Smith never came to the funeral home to speak with these families. Therefore, going forward, we are concerned with Mr. McClendon's conduct with respect to the Jones, Nash, and Wilson families.

No person from the Jones or Wilson families testified at trial. Ms. Nash was the

only person from these three families to testify. She testified that she did not ask for help finding a lawyer or ask any questions about a wrongful death lawsuit while at TFH. Despite not even having seen her child's body, she was asked about being introduced to some lawyers that were present at the funeral home. She twice stated in her testimony that "it wasn't the time or place" for such a thing. She and other family members were put in a room and were introduced to Mr. McClendon. Although she said there were others present, she remembered Mr. McClendon specifically. She explained that Mr. McClendon told her what he could do for her if he was allowed to represent her. According to Ms. Nash, Mr. McClendon said he could get her three million dollars and would pay for the funeral expenses if she decided to allow him to represent her. She understood that Mr. McClendon was there on behalf of the Firm, but she could not remember if he told her he was an attorney. However, she said that he presented himself as an attorney because of the things he said the Firm could get for her. Due to her interaction with Mr. McClendon, she felt violated because she was at the funeral home to bury her child and there were "a bunch of men in there trying to get [her] to sign some paperwork to be [her] lawyer."

Both Mr. and Mrs. Taylor, who were funeral directors at TFH, testified about their interactions with these three families. Mr. Taylor explained that his wife introduced Mr. McClendon to the families after funeral arrangements were handled. He said that Mr. McClendon then gave presentations to the families, but he himself was not present for the presentations. He knew that Mr. McClendon was not a lawyer and never heard Mr. McClendon say to the families that he was a lawyer. Mrs. Taylor admitted that none of the families asked to be introduced to the Firm. Instead, after the families handled their funeral arrangements, she mentioned to them that there was someone who wanted to give a presentation. She admitted that this was the first time the families found out that the presentation was going to take place. She stated that Mr. McClendon then met with the families and gave a presentation about the Firm. She was present for each of the presentations and did not remember Mr. McClendon ever saying he was an attorney. Mr. Witherspoon admitted that he was aware of Mr. McClendon travelling to Chattanooga to speak with the three families at TFH. He also admitted that he was aware Mr. McClendon gave the Jones family documentation in order to sign them up as clients.

Based upon this testimony, we find that there was material evidence to support the jury's verdict. Ms. Nash went to the funeral home to view her child's body, make arrangements, and go home. Instead, before she even had a chance to view her child's body, she was blindsided with an introduction to Mr. McClendon. She said that the situation was inappropriate and that she felt violated. Mrs. Taylor confirmed that this introduction happened to all three families. Perhaps most significantly, she testified that none of the three families asked for this introduction; rather, the families found out that the presentation was going to take place while in the process of handling the funeral arrangements for their deceased children. Not only was this situation inappropriate and distasteful given the circumstances, but Mr. McClendon's conduct was unlawful.

Pursuant to the UPL Statute, "[n]o person shall engage in the practice of law or do law business, or both, as defined in § 23-3-101, unless the person has been duly licensed and while the person's license is in full force and effect . . . ." Tenn. Code Ann. § 23-3-103(a). Furthermore, "[a]ny person who violates the prohibition in subsection (a) commits a Class A misdemeanor." Tenn. Code Ann. § 23-3-103(b). Both the definition for "law business" and the definition for "practice of law" include soliciting clients directly or indirectly, which is what Mr. McClendon, who was a nonlawyer, did when he engaged these three families at TFH. Tenn. Code Ann. § 23-3-101(1) and (2). Therefore, we find that there was material evidence supporting the verdict that Mr. McClendon's conduct violated the UPL Statute. While none of the witnesses testified that Mr. McClendon actually stated he was a lawyer, he made statements, such as what amount of money he could obtain for the wrongful death of Ms. Nash's child, which misled Ms. Nash to believe he was a lawyer. Specifically, Mr. McClendon said that he could get Ms. Nash three million dollars if she decided to allow him to represent her. Such a statement by Mr. McClendon, who was a nonlawyer, constituted the unauthorized practice of law because it required "the professional judgment of a lawyer." *Petition of Burson*, 909 S.W.2d at 776. Mr. McClendon's statement not only violated section 23-3-103 of the UPL Statute, but it also misled Ms. Nash to believe he was a lawyer in violation of section 23-3-108. Therefore, we also find that there was material evidence to support the verdict that Mr. McClendon, directly or indirectly, falsely advertised himself, or held himself out as, a lawyer. Tenn. Code Ann. § 23-3-108(a).

In addition to the UPL Statute, there was material evidence supporting the verdict that Mr. McClendon's conduct was "unfair" or "deceptive" in violation of the TCPA. Tenn. Code Ann. § 47-18-104(a) and (b). At a minimum, Mr. McClendon caused confusion or misunderstanding regarding his services and engaged in a deceptive act. *See* Tenn. Code Ann. § 47-18-104(b)(2), (3), and (27).

### ii.    *The Myers Family*

With respect to the Myers family, we are concerned with Mr. Smith's conduct. At trial, the State read excerpts from the deposition of Ms. Myers. She testified that Mr. Williams, who was an SFH employee, told her that he knew some people who could help with the funeral expenses. He explained to Ms. Myers that he would have someone from the Firm contact her to help with the funeral expenses. Mr. Smith then contacted her and emailed a copy of a wrongful death intake form to her sister. During this phone call, he told her that he was going to help her, that she did not have to worry about her child's funeral being paid for because the Firm was going to help her, and that she would have to pay the Firm back once she received settlement proceeds. Ms. Myers stated that Mr. Smith informed her that he worked for the Firm, but she did not remember him telling her that he was a lawyer. This was the only time she spoke with Mr. Smith. Thereafter, Mr. Williams asked Ms. Myers if she was going to sign the paperwork sent by Mr. Smith. Apparently, he told Ms. Myers that she had a limited amount of time to sign the paperwork in order for

the Firm to pay for the funeral. Ms. Myers expressed uncertainty about the decision. She also wondered why Mr. Williams was rushing her to sign the paperwork. She said that she ultimately signed the paperwork sent to her by Mr. Smith. According to Ms. Myers, Mr. Smith told her she would probably receive $50,000.00 in settlement proceeds for her child's death. Ms. Myers subsequently hired Mr. Blount to represent her in the wrongful death claim. She was unaware that the Firm was representing her because that was not how it was explained or presented to her. It was Ms. Myers's understanding that the Firm was going to help her take care of the funeral and that she would have to pay them back. Ms. Myers concluded by stating that she was not upset with the Firm for what they did; she just did not understand at the time that the Firm was representing her.

Mr. Blount ultimately disputed that Ms. Myers had an attorney-client relationship with the Firm and that she owed the Firm any money. He did not think that the paperwork Ms. Myers had signed was sufficient to establish such a relationship with the Firm. He explained that he never received a signed contract between the Firm and Ms. Myers setting out legal representation, including how much the Firm was going to get paid. The only document the Firm sent him as evidence that they represented Ms. Myers was the signed contract between Ms. Myers and Universal Funds Inc. Yet, since the Firm was claiming a portion of Ms. Myers's settlement in the wrongful death claim, the driver's insurer was not going to release any of the settlement proceeds until the attorney lien was resolved. Therefore, he filed a lawsuit on her behalf against the Firm in order to resolve the dispute. He testified that the dispute was ultimately resolved and that the Firm did not receive any of Ms. Myers's settlement proceeds. However, Ms. Myers's receipt of the settlement proceeds from the wrongful death claim were delayed due to this dispute.

Based upon this testimony, we find that there was material evidence to support the verdict. Defendants framed this particular issue suggesting that Ms. Myers asked Mr. Williams "to assist her with an attorney." However, the proof shows that Ms. Myers actually asked for help with her child's funeral expenses and was then put in contact with Mr. Smith from the Firm. Unbeknownst to her, instead of just receiving help with the funeral expenses, she signed an agreement in which she purportedly retained the Firm to represent her. According to Ms. Myers, she was unaware of the Firm's representation because it was not explained or presented to her in such a way.

Mr. Smith solicited a client in Tennessee despite not being a lawyer, and such conduct, as previously discussed, is a violation of the UPL Statute. *See* Tenn. Code Ann. §§ 23-3-101 and 23-3-103. Moreover, he told Ms. Myers that she would probably receive $50,000 in settlement proceeds for her child's death. Ms. Myers never stated that Mr. Smith told her he was a lawyer or that she believed Mr. Smith to be a lawyer based on his statement about the settlement proceeds. However, the statement made by Mr. Smith, who was a nonlawyer, about the settlement proceeds constituted the unauthorized practice of law because it required "the professional judgment of a lawyer." *Petition of Burson*, 909 S.W.2d at 776. In addition to the UPL Statute, we find that there was material evidence

supporting the verdict that Mr. Smith's conduct was "unfair" or "deceptive" in violation of the TCPA. Tenn. Code Ann. § 47-18-104(a) and (b). Like Mr. McClendon, Mr. Smith caused confusion or misunderstanding regarding his services and engaged in a deceptive act. *See* Tenn. Code Ann. § 47-18-104(b)(2), (3), and (27). Ms. Myers only sought help with the payment of her funeral expenses but instead found herself in a quandary regarding her legal representation which she was not apprised of.

Accordingly, we conclude that there is material evidence to support the jury's verdict finding Mr. McClendon and Mr. Smith engaged in impermissible conduct in violation of the UPL Statute and the TCPA. We affirm the trial court's determination that there was material evidence to support the jury's verdict.

### E. Attorneys' Fees

As a final matter, the State contends that it is entitled to an award of attorneys' fees on appeal. The particular statute related to actions brought by the attorney general provides that "[t]he court may . . . order reimbursement to the state for the reasonable costs and expenses of investigation and prosecution of actions under this part, including attorneys' fees." Tenn. Code Ann. § 47-18-108(b)(4). In addition to the TCPA, the UPL Statute provides that "[t]he attorney general and reporter *shall* be entitled to be reimbursed for the reasonable costs and expenses of investigation and prosecution of acts under this chapter, including, but not limited to, reasonable attorney fees and other witness fees." Tenn. Code Ann. § 23-3-103(c)(1) (emphasis added).

In Tennessee, we have "long followed the 'American Rule' with regard to attorney's fees." *Eberbach*, 535 S.W.3d at 474 (citing *State v. Brown & Williamson Tobacco Corp.*, 18 S.W.3d 186, 194 (Tenn. 2000)). Under the American Rule, "a party in a civil action may recover attorney's fees only if: (1) a contractual or statutory provision creates a right to recover attorney's fees; or (2) some other recognized exception to the American Rule applies, allowing for recovery of such fees in a particular case." *Id.* (quoting *Cracker Barrel Old Country Store, Inc. v. Epperson*, 284 S.W.3d 303, 308 (Tenn. 2009) (citing *Taylor*, 158 S.W.3d at 359; *John Khol & Co. P.C. v. Dearborn & Ewing*, 977 S.W.2d 528, 534 (Tenn. 1998))). Both the UPL Statute and the TCPA contain statutory provisions which allow the State to recover attorneys' fees. *See* Tenn. Code Ann. § 47-18-108(b)(4); Tenn. Code Ann. § 23-3-103(c)(1). Particularly, the UPL Statute states that the attorney general "*shall* be entitled to be reimbursed for the reasonable costs and expenses," which includes "reasonable attorney fees." Tenn. Code Ann. § 23-3-103(c)(1) (emphasis added).

The State has prevailed in this appeal. Therefore, we conclude that the State is entitled to an award of reasonable attorneys' fees incurred before this Court. We grant the State's request for an award of reasonable attorneys' fees on appeal and remand the case to the trial court for a determination of the appropriate amount of those fees.

## V. CONCLUSION

For the aforementioned reasons, we affirm the decision of the trial court and remand the case for further proceedings consistent with this opinion. Costs of this appeal are taxed to the appellants, The Witherspoon Law Group PLLC, Nuru Witherspoon, Alphonso McClendon, and Glenn Smith, for which execution may issue if necessary.

_____
CARMA DENNIS MCGEE, JUDGE